**ATLANTIC RICHFIELD CO.,**
**Plaintiff-Appellee,**

v.

**INTERSTATE OIL TRANSPORT CO.,**
**Defendant-Appellant.**

**No. 350, Docket 85–7550.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 28, 1985.
Decided Feb. 14, 1986.

George R. Daly, New York City (James D. Yellen, Bigham Englar Jones & Houston, New York City, of counsel), for defendant-appellant.

Thomas F. Molanphy, New York City (Charles B. Anderson, Haight, Gardner, Poor & Havens, New York City, of counsel), for plaintiff-appellee.

Before MESKILL, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal involves a claim for indemnity arising from a marine casualty. A time charterer of a gasoline tank barge that suffered a cargo loss sued a terminal owner claiming that its personnel's negligence in loading the cargo caused the loss. The terminal owner cross-claimed for the millions of dollars of property damages it sustained. During the trial, the time charterer paid the terminal owner $500,000 in settlement of its counter claim. It then sought indemnity from the party from which it had time-chartered the vessel. Following a trial on the indemnity claim, the district court granted full indemnity to the time charterer reasoning that it did not need to show actual liability to the terminal owner in order to recover the amount it paid in settlement. Instead, the district court believed that the potential liability which it found was all that was required. We reverse.

## I  BACKGROUND

### A. *Facts and the Parties*

At approximately 6:10 a.m. on October 25, 1972 an explosion occurred aboard the six-year old steel tank barge "OCEAN 80" moored at the General American Transpor-

tation Corporation Terminal at Arthur Kill in Carteret, New Jersey. The OCEAN 80 was loading gasoline and fuel oil at the time of the explosion and the subsequent fire destroyed and sank the barge and caused millions of dollars worth of damage to the terminal and nearby facilities. The shock of the explosion broke windows a mile from the scene, but there was no loss of life and only minor injuries.

This appeal involves three of the parties involved in the ensuing litigation: Interstate Oil Transport Company (Interstate), Atlantic Richfield Company (Atlantic), and General American Transportation Company (American). Interstate was the bareboat charterer of the tank barge OCEAN 80, from its owner Ocean 80 Co. Under such charter Interstate was in possession and command of the barge, and stood in the shoes of its owner. *See Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096–97, 8 L.Ed.2d 205 (1962). Several months prior to the October casualty, Interstate orally time-chartered the OCEAN 80 to Atlantic, which had chartered tank barges from Interstate for a number of years. A year earlier, on August 10, 1971, Atlantic leased storage facilities from American, including several tanks at Carteret, where it stored gasoline and fuel oil.

The incident occurred while Interstate and American employees were in the process of withdrawing these commodities from storage and pumping them into the tank barge OCEAN 80. As a result of the explosion, Interstate's tank barge was destroyed, Atlantic's cargo was lost and American's terminal facilities suffered extensive damages as did the property of third parties.

### B. *Prior Legal Proceedings*

In 1973 Interstate and Ocean 80 Co. petitioned for exoneration from, or limitation of, liability. Atlantic filed a claim for $233,699 against Interstate and American for the loss of its cargo. American counterclaimed against Atlantic for $5,000,000 damages to its facility and for indemnification for amounts to third parties to which it might be found liable. American had pre-viously filed an identical claim against Interstate in the limitation proceeding. Interstate and Ocean 80 Co. brought an action against American to recover for the loss of the barge. Additionally, third parties filed claims in the limitation proceedings against both Interstate and American. The central issue in these proceedings was to fix blame for the casualty thereby determining liability.

Central to the resolution of this question were the Findings and Conclusions of the United States Coast Guard (Coast Guard) and the National Transportation Safety Board (NTSB) both of which investigated the loss. In the NTSB's Findings and Conclusions it stated:

> [T]he probable cause of the casualty was the ignition, by an unidentified source, of gasoline which spilled from overflowing cargo tanks on the OCEAN 80. A major contributing factor was the failure of the barge tankerman and the terminal dockman to adhere to prescribed cargo transfer procedures.

Neither the tankerman nor the dockman had been directed to be continually present in the area of their responsibility. Their absence, the NTSB report noted, "precluded any attempt to take desired action."

The NTSB report listed the following defects in the loading procedures: the American dockman did not know the gasoline pumping rate and there was no metering device available at the terminal; the absence of qualified fire-fighting personnel at the American terminal delayed initial fire-fighting efforts which "might have prevented some of the extensive damage"; there was no valve status checkoff list maintained at the terminal; and the position of the various valves (open or closed) could only be determined by manual manipulation. Coast Guard regulations then in effect required the terminal to keep the transfer operation under "continuous control and surveillance" and to know the flow rate of the product. 33 C.F.R. 126.15(0).

The Coast Guard Marine Board of Investigation similarly determined that the ignition of gasoline on the barge's deck caused

the casualty. Although the ignition source was unidentified, the Coast Guard suspected one of the barge's several non-explosion proof electrical fixtures. The Coast Guard also concluded "that the absence of the tankerman precluded any action on his part to prevent the overflow," which was an "important and a major contributing cause of the casualty." The Coast Guard made several findings of fact concerning the barge's and the terminal's operation: upon its arrival at the American facility the barge was empty but not gas free; the facility had no permanent plant fire department and an insufficient number of personnel to fully man the equipment during the night shift; a search of the barge conducted after the explosion revealed a number of electrical appliances of "questionable approval for marine use"; a discharge valve normally closed during loading operations was found frozen in the open position; there was no guard or other security system in operation during nighttime hours; there was no fire or safety patrol at the facility; there was no means by which a supervisor could be constantly informed as to the status of the valves, equipment and the movement of product at all locations in the facility; and that "[t]estimony of several witnesses responsible for the safety, repair, maintenance and operation of the OCEAN 80 indicate[d] a general lack of understanding as to what constitute[d] Coast Guard 'approval.' "

In December 1976 after discovery had been concluded in the limitation proceeding, Interstate, Ocean 80 Co., Aetna Insurance Company (Aetna), and American reached a settlement agreement. Under its terms: (1) Interstate and Ocean 80 waived any claims against American for the loss of the barge OCEAN 80; (2) American and Aetna waived any claims against Ocean 80 Co. and/or Interstate for damages to American's facility arising out of the fire; (3) Ocean 80 Co. and Interstate paid $1,000,000 to American for its property damage; (4) three of the third-party claims were settled for $900,000 paid by American; with regard to the remaining third-party claims, Interstate agreed to contribute an additional $125,000 if American was required to pay more than $350,000 in settlement of those claims, and American agreed to indemnify Interstate from liability in excess of this amount; (5) Atlantic's claim for cargo loss brought against Ocean 80 Co., Interstate, and American and American's counterclaim against Atlantic were to continue in litigation; (6) in the event Atlantic recovered against Ocean 80 Co. and/or Interstate for its cargo loss, American agreed to indemnify and hold harmless Ocean 80 Co., the barge OCEAN 80, and Interstate for whatever sums may be due to Atlantic for the cargo loss; and (7) in consideration of this indemnification agreement, Interstate agreed to cooperate with American in the limitation proceeding and in the defense of "any and all pending actions arising from the fire and explosion on October 25, 1972 as if petitioning or defending for their own account."

The remaining third-party claims were subsequently settled and in May 1977 an order was entered in the limitation proceeding providing that: all parties except Atlantic having claims against Interstate arising out of the explosion were perpetually enjoined from instituting such suits; Atlantic's claim against American and American's $5,000,000 counterclaim were to proceed; Atlantic's claim against Interstate for the cargo loss was discontinued without prejudice to Atlantic's right to assert any claim it had immediately prior to the entry of the order; and all claims asserted against Interstate were dismissed.

Atlantic's action against American proceeded to trial before United States District Court Judge Conner on November 28, 1977. After three days of trial the parties agreed to settle. An Order was signed on December 2, 1977 embodying the settlement agreement. Under its terms Atlantic waived its claim for cargo loss and agreed to pay $500,000 to American in settlement of American's $5,000,000 counterclaim. The district court judge found this agreement a "fair and reasonable settlement of [the] litigation both as to liability and amount." The Order of settlement stated:

[I]t appears that [Atlantic] may be unable to sustain its burden of proving a causal relationship between any lack of reasonable care on the part of [American] in the handling of [Atlantic's] products and the loss thereof and ... the Coast Guard Marine Board of Investigation found contributory fault on the part of employees of [Interstate], operator of the Barge OCEAN 80, and ... it appears that [Atlantic] may be responsible to [American] for any negligence on the part of [Interstate], Ocean 80 Company or employees thereof, even without any other showing of negligence on the part of [Atlantic]....

The only notice Atlantic provided to Interstate of the settlement or of Atlantic's intent to claim indemnification was a telephone call made the night before the settlement was concluded. Atlantic's attorney in New York City called Interstate's attorney in Philadelphia advising him that a settlement was going to take place the next day. Interstate's attorney neither approved nor disapproved the settlement. Atlantic did not tender the defense of the action to Interstate. Prior to this conversation Atlantic had not made an indemnity claim against Interstate; the only claim Atlantic had ever made was for cargo loss.

### C.  Instant Action

On March 3, 1978 Atlantic commenced the instant indemnity action against Interstate in the Southern District of New York seeking to recover the amount of its $500,000 settlement with American. At the trial held before Judge Broderick, deposition testimony taken at the Coast Guard hearing and during discovery in the limitation proceeding was relied upon extensively. After trial, the district court held:

1.  Atlantic did not have to prove its actual liability to American, only its potential liability. The district court reasoned that Atlantic had provided Interstate with sufficient notice and opportunity to defend. The court further stated that because Interstate and American had agreed to cooperate in defending the cargo claim asserted against both by Atlantic, Atlantic's failure to tender defense of the counterclaim asserted by American was reasonable. The court concluded that Atlantic carried its burden of proving its potential liability to American.

2.  The settlement between Atlantic and American in which Atlantic surrendered its claim for cargo damage and paid $500,000 to American was reasonable.

3.  The release by American of any and all claims against Interstate and the dismissal of any and all claims of American did not preclude either American from suing Atlantic for a loss allegedly caused solely by Interstate's negligence or Atlantic from claiming in indemnity against Interstate for its payment to American.

4.  The tank barge OCEAN 80 was unseaworthy and Interstate breached its warranty of seaworthiness.

5.  Under paragraph seven of the August 1971 lease agreement between Atlantic and American, Atlantic was obligated to indemnify American.

6.  Interstate failed to meet its burden of proving that the statutory violations of its tankerman could not have caused the explosion.

7.  Interstate breached its personal warranty of seaworthiness and was not entitled to limit its liability.

From this judgment that indemnified Atlantic for $500,000 plus $420,454.57 in prejudgment interest, Interstate appeals.

### II  POTENTIAL LIABILITY

We first address Interstate's argument that the district court erred in holding that Atlantic did not have to prove its actual liability to American. The district court held that Atlantic's burden was merely to establish its potential liability, which the court found that it had met. This determination was based upon its finding "that the notice plaintiff [Atlantic] gave to defendant [Interstate] of its settlement with American was adequate." We are unable to

agree with the district court's conclusion that this notice satisfied due process requirements and that therefore only potential liability need be shown.

Courts have traditionally required a showing of potential liability only in cases where the indemnitor has been impleaded as a third-party defendant and tendered defense prior to settlement, *Damanti v. A/S Inger,* 314 F.2d 395, 396–97 (2d Cir.), *cert. denied sub nom., Daniels & Kennedy, Inc. v. A/S Inger,* 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64 (1963), or was impleaded and continuously informed of settlement negotiations or offered an opportunity to defend, *Parfait v. Jahncke Service, Inc.,* 484 F.2d 296, 304–05 (5th Cir.1973), *cert. denied sub nom., Home Indemnity Co. v. Ruppel and Ruppel v. Travelers Indemnity Co.,* 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974), or was adequately protected by continuing notice concerning the progress of settlement obligations and had a sufficient opportunity to approve or disapprove the settlement. *Burke v. Ripp,* 619 F.2d 354, 357–58 (5th Cir.1980). In contrast, proof of actual liability has been required where the indemnitor was neither tendered defense of the claim nor informed of the settlement until after its conclusion, *Tankredereit Gefion A/S v. Hyman-Michaels Company,* 406 F.2d 1039, 1042–44 (6th Cir.1969), the indemnitor was not tendered defense and did not participate in the settlement negotiations or approve the agreement. *Whisenant v. Brewster-Bartle Offshore Company,* 446 F.2d 394, 402–03 (5th Cir.1971).

In *Parfait,* involving an action by a contractor's employee against a vessel owner for injuries sustained in a fall while repairing the vessel's engine, the court explored the subject of actual-versus-potential liability. It stated that this issue "is unique to cases in which the original defendant (indemnitee) has settled with the original plaintiff without giving the third-party defendant (indemnitor) an opportunity to approve the amount of the settlement or to conduct the defense, and in which traditional indemnity principles are not modified by express contract between the parties." 484

F.2d at 304. The court distinguished those cases in which the indemnification claim was founded upon a judgment, a written contract, or the indemnitor was tendered the defense and refused it. *Id.* In the "unique" cases in which the indemnitee has not tendered the defense or provided the indemnitor a meaningful opportunity to approve or disapprove the settlement, the court stated that the indemnitee has the burden of showing that its disposition of the indemnitor's money did not violate equitable indemnity principles. *Id.*

At a minimum, such equitable indemnity principles require the indemnitee to prove its potential liability to the plaintiff. *Id.* (citation omitted). In *Jennings v. United States,* 374 F.2d 983, 986 (4th Cir.1967), the court held that "[t]he indemnitee's unilateral acts, albeit reasonable and undertaken in good faith, cannot bind the indemnitor; notice and an opportunity to defend are the indispensable due process satisfying elements." *Jennings* has been construed to mean that the opportunity to defend element may be satisfied by notice that an action against the indemnitee has been initiated. *Burke,* 619 F.2d at 358. But notice in this context must mean at least a meaningful opportunity to assume the defense. The *Parfait* court adopted the following solution to the indemnitee's burden of showing that the settlement did not violate equitable principles:

> A practical device by which an indemnitee can protect himself against the awkward possibility of having to prove the original plaintiff's case against himself, the original defendant, is to offer the indemnitor before any settlement is concluded the choice of (1) approving the settlement or (2) taking over the defense of the case and agreeing to hold the indemnitee harmless in any event for damages which may be assessed against him in excess of the amount of the proposed settlement.

484 F.2d at 304–05.

In *The Toledo,* 122 F.2d 255, 257 (2d Cir.), *cert. denied,* 314 U.S. 689, 62 S.Ct.

302, 86 L.Ed. 551 (1941), we adopted a view that "[a] claim for indemnity ... requires that an actual liability be sustained by the indemnitee, and if he settles a claim without a determination of the rights in question, he bears the risk of proving an actual liability in the action over for indemnity." (Citations omitted). In that case we held that the charterer failed to establish a lack of due diligence on the part of the vessel owners, and thus "failed to establish a right to indemnity based on an actual liability on its part." *Id.* Accordingly, we ruled that the trial court correctly denied the charterer's claim for damages because it acted as a "volunteer" when it compensated the cargo owners, since it was not even potentially liable for the delay caused by the latent defect in the crankshaft web. *Id.* Progressing logically from the rule in *Toledo,* we hold today that an indemnitee can only recover from an indemnitor upon proof of the indemnitee's potential liability if (1) the settlement is reasonable, and if (2) the indemnitor has sufficient notice in which to object to the settlement terms. When the indemnitor objects and the indemnitee fails to tender the defense of the action, the indemnitee must prove actual liability.

The cases cited by Atlantic for the proposition that it was not required to prove its actual liability to American are factually inapposite. Thus, for example, in *Damanti,* a longshoreman employed by a stevedore was injured while moving a hatch cover beam with a beam jack supplied by the ship on the defendant Inger's vessel, time chartered to Illinois Atlantic Corp. The plaintiff longshoreman sued Inger alleging negligence and unseaworthiness. Inger brought in as third-party defendants the stevedore and Illinois Atlantic, with each cross claiming against the other. The case was tried before a jury. Before summations, defendant Inger settled with the longshoreman after first offering third-party defendants an opportunity to assume the defense, which they declined. 314 F.2d at 396. Similarly, in *Burke,* the potential indemnitor was a third-party defendant in the main action against whom the indemni-

ty claim was made from the beginning of the litigation. Although the indemnitee did not invite the indemnitor to participate in the settlement negotiations, the indemnitor was kept advised that settlement negotiations were being conducted, and counsel for the indemnitor expressed no interest in participating. When informed of the proposed settlement, indemnitor's counsel voiced no objection. Further, when the terms of the settlement were placed on the record in open court, he remained silent. 619 F.2d at 358.

In sharp contrast, in the instant case the only notice Atlantic gave to Interstate of its settlement with American and of its indemnity claim was the already noted telephone call by Atlantic's counsel to Interstate's counsel on the night before the settlement. Atlantic's lawyer did not offer Interstate the choice of approving the settlement or assuming the defense. Moreover, Atlantic, prior to its settlement with American, gave no notice to Interstate that it was going to seek indemnity from Interstate for any liability or damage for which it might be held liable to American.

Thus, unlike *Damanti* and *Burke* where the indemnitors were advised from the beginning of the main action that an indemnity claim was being made and were informed of settlement negotiations, this case is more like *Whisenant* in several critical respects. There the indemnitor was not notified of the settlement negotiations until their conclusion; further, the indemnitee neither offered the proposed settlement to the indemnitor for approval nor tendered the defense of the claim. In addition, the record in *Whisenant* strongly suggested that the indemnitor, like Interstate in the present case, would have contested the original claim had there been an opportunity to do so. The district court in *Whisenant* entered judgment against the indemnitor solely on a finding that the settlement was reasonable. The case was later remanded for a determination of actual liability because the appellate court believed that the trial court's finding of a reasonable settlement was insufficient to support

a judgment against the indemnitor, absent a tendering of the defense or an "opportunity to review, pass upon, or participate in the settlement itself." 446 F.2d at 403.

In sum, the rule that has evolved from the cases cited is that where a party seeking indemnity settles with a plaintiff without giving the potential indemnitor an opportunity to approve the settlement, then such party has the burden of proof to show that equitable indemnity principles have not been violated. Notice sufficient to give the indemnitor a meaningful opportunity to defend is the indispensable element to be proven by the party seeking indemnity. If the indemnitor declines either to approve the settlement or to take over the defense, the indemnitee is required to prove only its potential liability to the plaintiff. Where notice—which includes a meaningful opportunity to assume the defense—is lacking, a demonstration of actual liability is required.

▇ Applying this rule to the instant case, Atlantic's failure to tender its defense to American's counterclaim to Interstate was not standing alone a serious omission that violated equitable principles given the settlement agreement between Interstate and American, under which Interstate agreed to cooperate with American in the defense of any and all pending actions arising out of the explosion. Yet, we do not rest our decision on that point alone. That failure, coupled with only 24-hours notice of the settlement, *did* violate equitable

principles. In that regard, we conclude that the district court's finding that Atlantic's overnight notice to Interstate was adequate is clearly erroneous because it did not afford Interstate a meaningful opportunity to assume the defense, if it so desired. *See Anderson v. City of Bessemer City, N.C.,* —— U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); Fed.R.Civ.P. 52(a). As a consequence, the district court erred in holding that Atlantic did not have to prove its actual liability to American.

## III ACTUAL LIABILITY

Interstate next asserts that Atlantic was not even potentially liable to American and therefore that this Court need not remand to the district court for a finding on the question of actual liability. Interstate further argues that because Atlantic was not potentially liable to American the district court erred in holding that the amount of Atlantic's settlement was fair and reasonable.

▇ Atlantic alleged two bases for its liability to American. First, Atlantic asserted that as time charterer of the barge OCEAN 80 it was responsible for the alleged negligence of Interstate's employees.[1] The district court correctly rejected this argument on the rationale that "[a] time charterer assumes no liability flowing from the unseaworthiness of the vessel or the negligence of the crew unless it is shown that the parties to the charter in-

---

1. An affidavit filed in 1980 by the attorney who tried and settled the case for Atlantic against American stated:

... the [American] counterclaims were not based solely on the indemnity provision contained in the Lease Agreement but, in addition, predicated alleged liability of [Atlantic] on failure to use due diligence to ascertain the seaworthiness of the barge OCEAN 80, the unseaworthiness of the barge OCEAN 80 and negligent acts or omissions of the crew of the barge OCEAN 80. In the course of the trial, [American] called as one of its principal witnesses the surveyor who had measured the capacity of the barge for Interstate. He testified that the capacity of the barge was substantially more than that found by the Coast Guard. Because the negligence which [Atlantic] had alleged against [American] was that

[American's] employee had allowed the gasoline and fuel oil to flow beyond the known capacity of the barge, [Atlantic's] basis for its cause of action against [American] was ended. Any negligence of [American's] employees would not have been a proximate cause of the explosion and fire. Obviously, Interstate knew this, elected to keep this knowledge secret from its customer [Atlantic] and elected to reveal it to [American] to defeat [Atlantic's] claim. The only remaining possibility was that Interstate's negligence or that of its employees had caused the casualty.

The true capacity of these tanks however, was established in a deposition held in the limitation proceeding on October 29, 1975, two years prior to the American-Atlantic trial at which deposition Atlantic's counsel participated.

tended otherwise." *Klishewich v. Mediterranean Agencies, Inc.* 302 F.Supp. 712, 713 (E.D.N.Y.1969) (citations omitted). We accept the finding of the district court that "[t]he evidence adduced at trial does not overcome the presumption that the time charterer (Atlantic) assumed no liability for the negligence of the bareboat charterer (Interstate)."

■ The second claimed basis was that under paragraph seven of the lease between American and Atlantic, Atlantic essentially became a guarantor or insurer of American's property and of American's liability to third parties, and that Interstate's negligence triggered the application of this provision. Paragraph seven states in relevant part:

Lessor [American] shall in no event, be liable for loss of or damage to Lessee's [Atlantic] commodities or property except when caused by Lessor's failure to use reasonable care in the safekeeping and handling of Lessee's property. Lessee [Atlantic] *shall exonerate, indemnify and save harmless Lessor [American] from and against any liability for damage of the property of Lessee, Lessor or others,* liability for injury (including death) to persons (including employees of Lessor) and all claims or actions in connection with such damage, based upon, arising out of or occurring in connection with the deposit or withdrawal of Lessee's material, *except such claims as arise out of Lessor's failure to use reasonable care in the safekeeping and handling of the Lessee's commodities or property.* (Emphasis added).

The district court interpreted "exonerate, indemnify and save harmless Lessor [American] from and against any liability for damage of the property of Lessee, Lessor or others" to mean that Atlantic agreed to reimburse American for any damage to *its or others* property arising from circumstances such as those in the instant case. We disagree.

Read as a whole, paragraph seven creates liability on Atlantic's part only with regard to third-party claims against American. Interstate's settlement of $1,000,000 with American reflected reimbursement for a significant amount of these third-party payments. The district court record reveals that the settlement of all the third-party claims amounted to $949,180. Paragraph seven does not render Atlantic liable to American for damage to American's own property; the language plainly refers to indemnification for liability to third parties. The inartful inclusion of the word "lessor" does not alter the meaning to one which supports Atlantic's liability; it merely creates ambiguity in a document which must be construed against its drafter, American. *Navieros Oceanikos, Etc. v. S.T. Mobil Trader,* 554 F.2d 43, 48 (2d Cir.1977) ("While this may not be the only possible interpretation ... the drafter of the contract, is not entitled to its construction of the indemnity clause. Having drawn an ambiguous agreement, one capable of two reasonable and practical interpretations, the defendants must be held to the interpretation least in their favor."); *See American Ex. Is. Lin., Inc. S/S Exp. Amb. v. United States,* 390 F.Supp. 63, 66 and n. 5 (S.D.N.Y.1975).

We addressed a similar question of contract interpretation in *Schiavone Const. Co., Inc. v. County of Nassau,* 717 F.2d 747 (2d Cir.1983). There, a construction company filed suit seeking to recover the cost of repair work on a sewage pipeline. The County sought indemnification from the engineering firm which had designed the project. The following indemnity clause was before us:

The Engineers agree that in the performance of its services hereunder, they will comply with any and all applicable provisions of the Labor Law of the State of New York. Further, the Engineers agree that they will be responsible for and *save the County harmless from all claims, damages, costs and expenses arising from the use of any patented articles in connection with the work and also arising from the performance of the work of the Engineers including damages to persons or property and*

*the defense, settlement or satisfaction of such claims.*

*Id.* at 750 (emphasis added).

In rejecting the claim that the provision covered loss to the alleged indemnitee's (County) own property, we stated:

The indemnity clause provides first that Consoer "will be responsible for and save the County harmless from all claims, damages, costs, and expenses arising from the use of any patented articles in connection with the work...." No legitimate argument could be made that "claims, damages, costs, and expenses," as there used, refers to anything other than direct liability to a third person. The words obviously do not refer to damage to the pipeline itself.

The County's argument that, when the clause "and also arising from the performance of the work of the Engineers" is added to the foregoing language, the words "claims, damages, costs, and expenses" take on a different meaning and include damages to the County's own pipeline, seems to be refuted by the clause "including damages to persons or property *and the defense, settlement or satisfaction of such claims.*" (Emphasis supplied). One does not defend, settle or satisfy damages to his own property.

*Id.* at 751. We also note in passing that indemnity agreements are generally designed only to protect against liability for damage to third parties. Every successful indemnity case cited by the County in *Schiavone* involved third party liability. *Id.*

Moreover, Atlantic would not be liable to American under paragraph seven of the lease inasmuch as the evidence of American's failure "to use reasonable care in the safekeeping and handling of the Lessee's commodities or property" is particularly strong. The district court itself recognized the significance of American's failure to exercise due care:

*Negligence on American's part certainly did play a role in the actual severity of the damage.* There was no procedure in place for a supervisor of American to be informed on an ongoing basis as to the status of valves or as to the movement of product through the American facility; the fire-fighters in the facility were off duty and thus their response to the fire was slow; the American dockman was away from the fuel transfer area for a period of time prior to the explosion and did not know the rate at which the fuel was being loaded into the barge; there was no centrally located valve status list available to the personnel, and valves had to be turned manually to determine if they were open or closed. These matters were noted by the Coast Guard in its report, and I accept them as established at this trial. (Emphasis added).

Further, the trial court noted, "there were only two tortfeasors in this incident: Interstate and American."

We are not inclined to give much weight to the district court statements in the earlier action between Atlantic and American that the settlement was "fair and reasonable ... both as to liability and amount." Instead, it appears that Atlantic, faced with American's $5,000,000 damage claim, decided as a matter of trial strategy to settle for $500,000. In its own self-interest Atlantic entered into this settlement with American perhaps thinking it incurred no risk because it could look to Interstate for indemnity. Yet, by failing to give notice to the indemnitor sufficient for it to have some say over whether its funds were being well-spent, Atlantic eliminated indemnity as a possibility and demonstrated the truth of the adage that one who quickly pays ahead of time takes the risk that he will not later be well-served.

Because the case was settled, the district court did not receive the benefit of the kind of adversarial presentation that would lend weight to its view; the kind, for example, that would have been provided had Interstate been impleaded and appeared as a third-party defendant in the action. This inevitably contributed to the district court making a clearly erroneous finding regarding the reasonableness of the settlement.

**116**

Moreover, holding Interstate to be an indemnitor under circumstances where it was entitled to—but did not receive—adequate notice, without hearing Interstate's arguments against such status contravenes firmly fixed due process concerns. *Cf. Windsor v. McVeigh*, 3 Otto 274, 277, 93 U.S. 274, 277, 23 L.Ed. 914 (1876). Thus, Judge Conner's finding that the settlement was fair and reasonable, adopted by Judge Broderick, was clearly erroneous.

### IV CONCLUSION

Since Atlantic has not shown even potential liability, we need not remand the case. The question of whether the district court erred in not dismissing Atlantic's complaint on the ground that the release given to Interstate by American and the dismissal of American's claims precluded any action by Atlantic against Interstate is moot.

Central to the district court's findings that Interstate was liable in indemnity to Atlantic was its determination that Interstate breached its implied warranty of seaworthiness. Yet, since Atlantic failed to demonstrate even its potential liability to American, review is unnecessary on the question of whether Interstate breached its implied warranty of seaworthiness and the related questions of whether Interstate had the right to limit its liability and whether Interstate failed to meet its burden of proving that the statutory violations of its tankerman could not have caused the explosion and the resulting damage.

The judgment of the district court is reversed and Atlantic's complaint is dismissed.