**S.A. CARMEUSE and Calcitherm Holding N.V., Plaintiffs,**

v.

**M.J. STAVOLA INDUSTRIES, INC. and Citibank, N.A., as Escrow Agent, Defendants.**

**No. 91 Civ. 7642 (RLC).**

United States District Court, S.D. New York.

May 10, 1993.

Sullivan & Cromwell (Philip L. Graham, Jr., Anthony DiSarro, Jeffrey W. Berkman, of counsel), New York City, for plaintiffs.

Parker Chapin Flattau & Klimpl, New York City (Stephen G. Rinehart, of counsel), for defendant M.J. Stavola Industries, Inc.

Citibank, N.A., New York City (Rebecca Knowles, of counsel).

## OPINION

ROBERT L. CARTER, District Judge.

On December 24, 1986, the plaintiffs, S.A. Carmeuse and Calcitherm Holding N.V., sold the defendant, M.J. Stavola Industries, Inc. ("MJS"), all of the outstanding common stock of Amcar, Inc. ("Amcar"), a Florida-based holding company with three subsidiaries, Dixie Lime and Stone Company ("Dixie"), Tonk Products, Inc. ("Tonk"), and Southern Materials Corporations ("SMC"). Pursuant to the Stock Purchase Agreement executed in connection with that transaction (the "Agreement"), $1 million of the $13.9 million purchase price was placed into an interest-bearing escrow account at Citibank (the "Escrow Fund") in order to secure certain obligations of plaintiffs to indemnify MJS. MJS subsequently submitted 33 claims for indemnification, totalling $1,578,394, however plain-

tiffs disputed the validity of virtually every claim.[1]

According to the terms of the Escrow Agreement, executed in conjunction with the Stock Purchase Agreement, if claims for indemnification were timely asserted by MJS, then Citibank was to retain that portion of the Escrow Fund claimed and distribute the remainder to Carmeuse and Calcitherm. The retained portion would be released by Citibank in accordance with either (i) written instructions signed by Carmeuse, Calcitherm and MJS or (ii) a court order. Since the parties have been unable to agree to a distribution of the Escrow Fund, the plaintiffs commenced this lawsuit, in part, to obtain a declaration, pursuant to 28 U.S.C. § 2201, resolving the parties' dispute with respect to the 33 items.[2] MJS counterclaimed for: (i) declaratory judgment regarding its rights to the Escrow Fund; (ii) breach of contract due to numerous alleged misrepresentations concerning the same list of items; and (iii) conversion of certain insurance proceeds. This case is presently before the court on plaintiffs' partial summary judgment motion, pursuant to Rule 56, F.R.Civ.P., as to 10 of MJS' breach of contract claims and 23 of the items for which MJS seeks indemnification.

I

■ Plaintiffs contend that they are entitled to partial summary judgment on MJS's second counterclaim for breach of contract because the defendant cannot demonstrate with respect to items numbered 2, 7, 9–12, 14, 20, 22, and 25 that plaintiffs breached any representation or warranty or that defendant sustained any damages.

According to MJS, the "Hot Rock Elevator Chain" (Item 7), "Silo # 7" (Item 11), and the "Ball Mill" (Item 25) were not in "good operating condition and repair" in contravention of section 3(p) of the Agreement.[3] Specifically, MJS alleges: that the elevator chain was defective, resulting in three breakdowns, and was ultimately replaced; that the design and construction of the silo were seriously flawed, requiring extensive reinforcement, rewelding and additional steel supports; that the silo had shifted laterally approximately sixteen inches, and the concrete lining of the silo was flaking off and falling into the product; and that the ball mill was "not merely inefficient ... it was useless and worthless." Def.Mem. p. 22.

Plaintiffs' contention that MJS has not presented any evidence in support of these claims is simply wishful thinking. MJS has produced servicing bills for the elevator chain;[4] various internal SMC memoranda, predating the Agreement, which discuss replacement of the ball mill;[5] and several engineering reports concerning the dilapidated condition of the silo.[6] Although the plaintiffs strenuously dispute the meaning and significance of these documents, the role of the court in deciding a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue" of fact which must be reserved for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Since a genuine factual dispute exists regarding the operating condition of the mill, elevator chain and silo, plaintiffs motion must be denied as to these items.[7]

1. Plaintiffs agreed to only two claims, nos. 15 and 18, totalling $4,701.91.

2. Plaintiffs are not seeking summary judgment on their second cause of action which alleges that MJS failed to provide severance pay to a terminated employee in breach of section 5(j) of the Agreement.

3. Section 3(p)(vi) of the Agreement states, in relevant part, "Except as set forth in Schedule Q hereto, the plants structures, tangible properties and equipment owned, operated or leased by the Company or any Subsidiary are in good operating condition and repair in the ordinary course of business, ordinary wear and tear excepted ..."

4. DiSarro Aff.Exh. 20.

5. *See also* DiSarro Aff.Exh. 21.

6. DiSarro Aff.Exh. 16.

7. Similarly, plaintiffs' contention that MJS could not demonstrate any loss as a result of these alleged breaches is simply not straightforward. According to MJS, the "worthless" ball mill was valued in Amcar's books at $69,000 (DiSarro Aff.Exh. 21); the leaky silo will cost $200,000 to replace (DiSarro Aff.Exh. 16); and the defective elevator chain resulted in a $62,000 loss from repairs, replacement, and interruptions in production (DiSarro Aff.Exh. 20).

■ MJS also asserts a claim based on three Mack trucks (Item 10) which were leased by Carmeuse in 1985. The defendant maintains that the condition of these trucks also violated the warranty in section 3(p) of the Agreement because they were completely unsuited for their intended purpose of carrying heavy loads on ungraded surfaces. After experiencing difficulties with the trucks, MJS allegedly had to replace the vehicles at great expense while remaining liable on the original lease. DiSarro Aff.Exh. 18. As the plaintiffs properly point out, however, the plain language of section 3(p) pertains to the condition and repair of the purchased equipment, not its suitability for a particular purpose. Since defendant merely contends that other trucks were better suited to Amcar's hauling needs, and has not maintained that the trucks were in other than good condition or repair, MJS has not alleged a breach of the warranty. Thus, based on the plain language of section 3(p), summary judgment is granted as to item 10. *See Bethlehem Steel Co. v. Turnet Construction Co.*, 2 N.Y.2d. 456, 460, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957) ("where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary"); *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").

Item 9 concerns a spill of liquid waste from SMC's property onto six acres of an adjoining property, a condition about which MJS was allegedly not informed prior to its purchase of Amcar. DiSarro Aff.Exh. 14. MJS contends that this condition constituted a breach of the representations and warranties in section 3(p), which provides, in relevant part, that Amcar's mining operations "do not and would not conflict with any statute, regulation, order, ordinance or law of the United States of America or any state, local or foreign jurisdiction," and section 3(v), which represents that Amcar and its subsidiaries are in compliance with all applicable statutes, regulations, ordinances, orders and other laws.

Plaintiffs disingenuously contend that these provisions were not breached because MJS has not been subject to any fines or penalties nor have any claims been filed against it as a result of the spillage. The fact that no action has been taken against MJS in connection with the spillage, however, does not disprove defendant's allegation that an unlawful condition existed.[8] Thus, plaintiffs' motion is denied as to item 9.

MJS also claims that, after the acquisition, it discovered that certain payments due to former employees of Tonk (Item 12) had not been disclosed in the schedules of notes payable annexed to the Stock Purchase Agreement or in the financial statements provided to MJS.[9] Although plaintiffs do not contest that the nondisclosure violated several warranties in the Agreement, they claim that MJS has presented no evidence that it actually had to pay the notes. Indeed, the only evidence offered by MJS is a letter dated October 16, 1990, in which it advised plaintiffs that it was compelled to pay the notes in order to consummate its resale of Tonk. DiSarro Aff.Exh. 29 at 7. Since the assertion in that letter was unsubstantiated and would clearly be inadmissible at trial, it cannot constitute evidence sufficient to defeat a motion for summary judgment. *See, e.g., Wade v. New York Tel.*, 500 F.Supp. 1170, 1176–7 (S.D.N.Y.1980) (Carter, J.) (Under Rule 56, unsupported allegations of counsel may be disregarded in determining whether genuine issues of fact exist.). Thus, plaintiffs' motion is granted as to item 12.

■ Item 14 concerns plaintiffs' alleged misrepresentation to MJS, set forth in a May, 1985 memorandum, that each ten acre-

---

8. Since MJS never removed the spillage and subsequently sold SMC, plaintiffs also contend that summary judgment is appropriate on item 9 because MJS did not sustain a loss. However, the defendant allegedly spent $100,000 to repair the condition which caused the overflow. It is also likely that some portion of the $475,700, which MJS estimated as the cost to clean up the spill, was reflected in the price at which it sold SMC. *See* DiSarro Aff.Exh. 13.

9. *See* DiSarro Aff.Exh. 22.

block of the "Dixie Acreage" would yield 1.8 million tons of minerals. DiSarro Aff.Exh. 19. Since MJS's own geological survey allegedly concluded that the yield would be only 1.67 million tons,[10] MJS claims that plaintiffs breached section 3(cc) of the Agreement. That section provides: "No representation or warranty made by either Seller in this Agreement or as provided herein contains any untrue statement of any material fact...."

Plaintiffs argue that the May, 1985 memorandum is irrelevant since the warranty in section 3(cc) only applies to representations made in the Stock Purchase Agreement. Indeed, there is no basis upon which to conclude that the parties intended to incorporate into the Agreement an internal memorandum written well over a year earlier. Section 3 of the Agreement contains an exhaustive list of 29 representations and warranties by the sellers, none of which relate to the yield of the Dixie Acreage. Plaintiffs' interpretation is also consistent with section 12 of the Agreement which provides, in relevant part:

> "No representation ... has been made by either Seller or Buyer which is not embodied in this Agreement or the other agreements referred to herein and entered into in connection herewith, the Schedules or Exhibits hereto, or the written statements, certificates or other documents delivered pursuant hereto, and neither of the Sellers nor Buyer shall be bound by or liable for any alleged representation ... not so set forth."

Since the warranty in section 3(cc) is not reasonably susceptible of the broader interpretation urged by the defendant, plaintiffs' summary judgment motion is granted as to item 14.

■ Item 20 concerns an alleged violation of a representation made by plaintiff in section 3(j)(iii) of the Agreement. This section states, in pertinent part, that since September 30, 1986, and up until November 14, 1986, "there has not been any ... waiver of

any rights of substantial value to the company or any subsidiary...." According to MJS, contrary to this representation, on October 30, 1986, plaintiffs signed away Dixie's rights to file a lien against the assets of C–Way Construction Corporation in the event of non-payment of the contract price for a shipment of limestone. DiSarro Aff. Exh. 23. C–Way ultimately failed to pay the contract price, and MJS obtained a judgment of $31,-151.13. As a result of the lien waiver provision, MJS alleges that it was compelled to settle the claim for $15,000 because of doubts concerning collectibility in the absence of a valid lien.

Plaintiffs argue that they are entitled to summary judgment on item 20 because the agreement not to file a mechanic's lien does not constitute a "waiver" as a matter of law. According to plaintiffs, who cite no caselaw, a "waiver" is the "voluntary relinquishment of a *pre-existing* right." Pltf. Reply at 12 (emphasis added). Since the agreement to sign away rights to file a lien was a part of the consideration exchanged in Dixie's contract with C–Way, plaintiffs reason that the right to file a lien was relinquished before it ever vested, and thus, cannot constitute a waiver. Pltf.Mem. at 24. Under New York law, however, a waiver occurs "where a person dispenses with the performance of something which he has a right to exact *or could have demanded or insisted upon if he chose to do so.*" 57 N.Y.Juris.2d § 74 at 105–06. (emphasis added). Plaintiffs' strained argument that the right never "existed" is, therefore, irrelevant. The concept of "waiver" is broad enough to encompass the relinquishment of Dixie's right to file a mechanic's lien so long as that right could have been asserted. *Id.* Since, plaintiffs have not contended that the lien waiver provision was an unavoidable element of the C–Way contract, their motion as to item 20 must be denied.[11]

Item 2 related to allegedly bad debts in excess of Dixie's reserves in contravention of plaintiffs' representation in section 3(h) of

---

10. DiSarro Aff.Exh. 19.

11. Significantly, in the three years since defendant asserted claim 20, plaintiffs never objected on the grounds that there was no "waiver." Earlier, they insisted that the waiver of lien rights did not fall within the purview of section 3(cc) because it was not a right of "substantial" value, Houghton Aff.Ex.R. at 4, an argument which they have apparently dropped.

the Agreement.[12] However, MJS admitted that it was ultimately able to collect the debt, and withdrew this claim by letter dated October 16, 1990. See Exh. 29 p. 2. Item 22 concerns the attorneys' fees allegedly incurred by MJS in collecting the debt described in Item 2. See DiSarro Aff.Exh. 24. Since MJS's claim for recovery of the attorneys' fees is premised on the same alleged breach of section 3(h) as in item 2, a breach which defendant apparently conceded did not occur, there is no basis in law for that claim to proceed. Thus, summary judgment is required as to both these items.

## II

Plaintiffs also seek summary judgment on their first claim and MJS's first counterclaim regarding their respective rights to the Escrow Fund. They contend that the indemnification provision, section 8(b) of the Agreement,[13] applies only to losses incurred as a result of a claim or lawsuit filed by a third party, and does not apply to 23 of the items, including the ten discussed above, which do not involve third party liability.

Indeed, the Second Circuit has noted in dicta that "indemnity agreements are generally designed only to protect against liability for damage to third parties." *Atlantic Richfield Co. v. Interstate Oil Transport Co.,* 784 F.2d 106, 114–15 (2d Cir.), *cert. denied,* 479 U.S. 817, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986). *See also, Schiavone Constr. Co. v. County of Nassau,* 717 F.2d 747, 751 (2d Cir.1983); *Sundance Cruises v. American Bureau of Shipping,* 799 F.Supp. 363, 377–78 (S.D.N.Y. 1992) (Knapp, J.). In addition, indemnification clauses "must be strictly construed so as not to [impose] any obligations the parties never intended to assume." *Haynes v. Kleinewefers,* 921 F.2d 453, 456 (2d Cir.1990) (citing *Levine v. Shell Oil Co.,* 28 N.Y.2d 205, 211, 321 N.Y.S.2d 81, 85, 269 N.E.2d 799, 802 (1971)). However, *Atlantic Richfield,* like other cases cited by the plaintiffs, concerned indemnifications provisions that were narrower on their face than the present clause.[14] The more expansive language of Section 8(b), which extends coverage to all "liabilities, losses, damages, deficiencies, costs or expenses," rather than only covering liabilities, suggests that a broad concept of indemnity may have been intended.[15] Since all ambiguities must be resolved in favor of the non-movant, *Beacon Enterprises, Inc. v. Menzies* 715 F.2d 757, 762 (2d Cir.1983), summary judgment cannot be granted as to the meaning of the clause even if plaintiffs' interpretation is more plausible than defendant's. *Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1270 (2d Cir. 1989). Accordingly, plaintiffs' motion is de-

---

**12.** Section 3(h) provides: "Sellers have delivered to Buyer true and complete copies of the following consolidated financial statements of the Company and its Subsidiaries, each of which has been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods indicated, is in accordance with the books and records of the Company and its Subsidiaries and fairly presents the consolidated financial position and results of operations of the Company and its Subsidiaries, as of dates and for the periods indicated ..."

**13.** Section 8(b) of the Agreement provides, in pertinent part:
"Each Seller [Plaintiffs] shall fully, jointly and severally indemnify and hold harmless Buyer [MJS] against and in respect of any and all liabilities, losses, damages, deficiencies, costs, or expenses (including without limitation, the reasonable fees and expenses of counsel) (collectively "Losses") resulting from (i) any misrepresentation or breach of any representation, warranty, covenant or agreement by either Seller made in this Agreement ..."

**14.** In *Atlantic Richfield Co. v. Interstate Oil Transport Co.,* 784 F.2d 106, 114–15 (2d Cir.) *cert. denied,* 479 U.S. 817, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986), the relevant clause stated that "Lessee [Atlantic] shall exonerate, indemnify and save harmless Lessor [American] from and against any *liability* for damage of the property of Lessee, Lessor or others ..." (emphasis added).

**15.** Plaintiffs' assertion that "indemnification" always pertains to third party liability is plainly an overstatement belied by the very cases cited in their brief. To state, as the Second Circuit does in *Atlantic Richfield,* that indemnification *generally* protects against third party liability, assumes that the concept of indemnity can sometimes extend further. It is also significant that, until they commenced this lawsuit, the plaintiffs never asserted that the indemnity clause was limited to third party liability even though the parties' corresponded regarding these claims over a three year period. *See* Houghton Aff.Exhs. K–T.

nied as to items 3–5, 7, 9, 11, 17, 20, 21, 23–25, 28, and 33. However, summary judgment must be granted as to the indemnification claims based on items 2, 10, 12, 14 and 22 since the underlying breach of warranty claims have been dismissed.

### III

Plaintiffs also seek to dismiss indemnification items 29–33 on the ground that they were not timely asserted within the two year limitation period set forth in the Escrow Agreement. The Escrow Agreement provides that, by the second anniversary of the signing of that agreement (i.e. December 24, 1988), the Escrow Fund would be released to plaintiffs except for "the amount of ... all Pending claims as of such [date]." Claims deemed to be "Pending" are defined as:

> "a claim as to which on or prior to such date [MJS] shall have delivered to [plaintiffs] and the Escrow Agent a written notice signed by an officer of [MJS] which notice shall have been received by the Escrow Agent, stating that [MJS] has in good faith asserted a claim or claims for indemnification pursuant to the Purchase Agreement ... and specifying the nature and amount of such claim(s)." DiSarro Aff.Ex. 9 at 5.

Items 29–32 were referenced in a letter dated June 28, 1988, however plaintiffs contend that they did not constitute "pending" claims as of the two-year anniversary because the letter (i) was signed by an attorney representing MJS rather than an officer of MJS, (ii) did not confirm that the claims asserted therein were made in good faith, and (iii) did not specify the nature and amount of those claims.

Although plaintiffs' first two objections may be de minimus, as urged by the defen-

dant, see, e.g., Kaplan v. Lippman, 75 N.Y.2d 320, 552 N.Y.S.2d 903, 552 N.E.2d 151 (1990), the requirement that defendant's letter provide a description of the claims is an essential purpose of the notice provision. The only details provided by the June 28, 1988 letter were as follows:

| | | | |
|---|---|---|---|
| 29 | Amcar | 32,022.93 | Roberts Settlement |
| 30 | SMC | 13,395.80 | Backhow & Grader |
| 31 | SMC | 10,322.44 | Bagging Equipment |
| 32 | Amcar | 3,672.66 | Maitland Offices |

These descriptions are mere captions. The letter provides no notice regarding which section of the Agreement was allegedly breached and lacks even a skeletal summary of the relevant facts underlying the claims. The defendant cannot seriously contend that these paltry details "specif[ied] the nature of the claim". Furthermore, Carmeuse advised defendant by letter dated July 19, 1988, to submit further information about the claims, yet MJS did not respond until March 31, 1989, over eight months later and three months past the deadline. See Houghton Aff.Exhs. M, N, and O.[16] Since MJS did not assert claims 29–32 in a timely manner in accordance with the Agreement, plaintiffs' summary judgment motion is granted with respect to these claims.

Item 33 concerns plaintiffs' alleged conversion of a $75,000 insurance check, and was first asserted by defendant in a letter dated September 13, 1989, long after the expiration of the two-year period. However, Section 8(b) of the Agreement expressly states that the two year period "shall not preclude Buyer from initiating any claim for indemnification in respect of any matter *other than* misrepresentation or breach of warranty at any time," (emphasis added). Since item 33 does not concern any breach of warranty or misrepresentation, this item is not time-barred. Accordingly, summary judgment is denied.

---

**16.** Defendant also argues that its claims 29–32 were preserved simply because they were asserted in writing within the two-year period in satisfaction of Section 8(a) of the Agreement. That section provides, in relevant part, "all representations and warranties related to *any claim asserted in writing* prior to the applicable Survival Period *shall survive* until such claim shall be resolved and payment in respect thereof, if any is owing, shall be made." (emphasis added) However, the Stock Purchase Agreement and Escrow Agreement must be construed together since they were executed by the same parties, at substantially the same time, were related to the same transaction, and effectuated a common purpose. *See, e.g., Carvel Corp. v. Diversified Mgmt Group, Inc.,* 930 F.2d 228, 233 (2d Cir.1991); 22 NY Juris.2d § 226. Thus, defendant's interpretation of Section 8(a) must be rejected since it would render utterly superfluous the precise and explicit procedure set forth in the Escrow Agreement.

*Conclusion*

Plaintiffs' motion for partial summary judgment is denied in part and granted in part as set forth above. The parties must submit a pretrial order within 30 days from the date of filing of this opinion.

**IT IS SO ORDERED.**