In re: COOPER MANUFACTURING CORP., and its Affiliates; Challenger Rig & Manufacturing, Inc.; Cooper Offshore Systems, Inc.; and Cooper Sales Corp., Debtors,

Jon A. Barton, Liquidating Trustee, Plaintiff,

v.

The Home Indemnity Company; et al., Defendants.

The Home Indemnity Company, Third Party Plaintiff,

v.

The Holmes Organisation, Inc.; and Kent A. Bogart, Third Party Defendants.

Nos. 84–01061–W, 94–C–901–BU. Adv. No. 94–0282

United States District Court, N.D. Oklahoma.

Feb. 7, 2001.

Order Denying Reconsideration to Report and Recommendation, June 22, 2000.

**1240**

William Robert Grimm, J. Patrick Mensching, Jr., William Brad Heckenkemper, Barrow Gaddis Griffith & Grimm, Tulsa, OK, Burton J. Johnson, Bradley Kent Donnell, Looney Nichols & Johnson, Oklahoma City, OK, Neil J. Dilloff, Brett Ingerman, Catherine M. Simmons, Piper Marbury Rudnick & Wolfe LLP, Baltimore, MD, Stephen R. Mysliwiec, Piper & Marbury, Washington, DC, Katresa J. Riffel, Gungoll Jackson Collins & Box PC, Enid, OK, for Home Ins. Indemnity CO.

Thomas G. Wolfe, Raymond Edward Zschiesche, Gerald F. Pignato, Phillips McFall McCaffrey McVay & Murrah, Robert E. Manchester, Shannon K. Emmons, Raymond Thompson Cooper, Manchester & Pignato, Oklahoma City, OK, Kent A. Bogart, Steven Ernest Holden, Bruce Alvin McKenna, Stephen J. Capron, Holden Glendening & McKenna, Tulsa, OK, for Holmes Organisation, Inc.

### ORDER

BURRAGE, District Judge.

On June 2, 2000, United States Magistrate Judge Sam A. Joyner issued a Report and Recommendation, wherein he recommended that Third–Party Defendant, The Holmes Organisation, Inc.'s motion for summary judgment be denied. On June 20, 2000, Third–Party Defendant, The Holmes Organisation, Inc., filed a motion requesting Magistrate Judge Joyner to reconsider his Report and Recommendation. Magistrate Judge Joyner denied Third–Party Defendant's motion by Order filed June 22, 2000.

Presently before the Court are the objection and supplemental objection of Third–Party Defendant, The Holmes Organisation, Inc., to the Report and Recommendation, the objection of Third–Party Defendant, Kent A. Bogart, to the Report and Recommendation and the objection of Third–Party Defendant, The Holmes Organisation, Inc., to Magistrate Judge Joyner's Order denying its motion to reconsider.[1] Pursuant to 28 U.S.C. § 636(b), the Court has conducted a *de novo* review of the matter. Having done so, the Court finds that the objections are without merit. The Court accepts the Report and Recommendation and the Order denying the motion to reconsider in their entirety.

Third–Party Defendant, The Holmes Organisation, Inc., in its objection, and Third–Party Defendant, Kent A. Bogart, by separate application, request the Court to certify certain questions of law to the Oklahoma Supreme Court. The Court, upon due consideration, finds that such requests should be denied. The Court finds that the added delay and expense resulting from certification is unwarranted.

Accordingly, the Report and Recommendation issued by United States Magistrate Judge Sam A. Joyner (Docket Entry # 322) is **AFFIRMED**. The Order issued by United States Magistrate Judge Sam A. Joyner (Docket Entry # 336) denying Third–Party Defendant, The Holmes Organisation, Inc.'s Motion to Reconsider is also **AFFIRMED**. The Motion for Summary Judgment of Third–Party Defendant, The Holmes Organisation, Inc. (Docket Entry # 247) is **DENIED**. The Unopposed Application for Oral Argument filed by Third–Party Defendant, Kent A. Bogart (Docket Entry # 334) is also **DENIED**. The Request of Third–Party Defendant Kent A. Bogart for Certification of Questions of Law (Docket Entry # 337)

---

1. In addition to his objection, Third–Party Defendant, Kent A. Bogart has filed an application for oral argument. Because the Court finds that oral argument is not necessary for a ruling on the objection

and request of Third–Party Defendant, The Holmes Organisation, Inc., for certification of questions of law are also **DE-NIED.**

**REPORT AND RECOMMENDATION**

JOYNER, United States Magistrate Judge.

## TABLE OF CONTENTS

I. FACTUAL/PROCEDURAL SUMMARY ....................................1242
 A. THE RELATIONSHIP BETWEEN HOME, HARBOR, HOLMES AND COOPER .........1242
 B. COOPER DISCOVERS DEFECTIVE STEEL IN ITS WORKOVER RIGS. ..............1242
 C. COOPER, FACING NUMEROUS PRODUCT LIABILITY LAWSUITS FOR SELLING DEFECTIVE WORKOVER RIGS, FILES FOR BANKRUPTCY ....................1243
 D. COOPER'S COVERAGE CASE IN THE BANKRUPTCY COURT .....................1244
 E. THE UNDERLYING BAD FAITH CASE IN THIS COURT ..........................1244
 F. HOME'S INDEMNITY AND CONTRIBUTION CLAIMS AGAINST HOLMES ...........1245
 1. Prior Appeal to the Tenth Circuit .............................1245
 2. Current Motion for Summary Judgment ........................1246
II. SUMMARY JUDGEMENT STANDARDS ...................................1246
III. CHOICE OF LAW ......................................................1247
IV. COUNT I—THERE ARE MATERIAL QUESTIONS OF DISPUTED FACT WHICH PRECLUDE THE ENTRY OF SUMMARY JUDGMENT ON HOME'S INDEMNITY CLAIM .............................1247
 A. HOME'S FAULT .................................................1248
 1. Holmes' Alleged Failure to Notify .............................1249
 2. Holmes'/Mr. Bogart's "No Coverage" Opinion .......................1250
 3. Conclusion .................................................1251
V. COUNT I—HOME NEED ONLY ESTABLISH POTENTIAL, NOT ACTUAL, LIABILITY TO COOPER FOR ITS ALLEGED PRE–BANKRUPTCY FAILURE TO DEFEND COOPER .........................1252
 A. THE RULE — AN INDEMNITEE MAY SETTLE THE INJURED PARTY'S CLAIM AND SEEK INDEMNIFICATION FROM A PUTATIVE INDEMNITOR WITHOUT HAVING TO ESTABLISH ITS ACTUAL LIABILITY TO THE INJURED PARTY AS LONG AS THE INDEMNITOR WAS ON NOTICE OF THE INJURED PARTY'S CLAIM AND GIVEN AN OPPORTUNITY TO PARTICIPATE IN SETTLEMENT NEGOTIATIONS AND OBJECT TO THE SETTLEMENT ......................................1252
 B. APPLICATION OF THE RULE — HOME NEED ONLY PROVE THAT IT WAS POTENTIALLY LIABLE TO COOPER BECAUSE HOLMES WAS ON NOTICE OF COOPER'S CLAIM AND HOLMES HAD AN OPPORTUNITY TO PARTICIPATE IN SETTLEMENT NEGOTIATIONS AND TO OBJECT TO THE SETTLEMENT ...........1256
VI. COUNT II—THERE ARE MATERIAL QUESTIONS OF FACT WHICH PRECLUDE THE ENTRY OF SUMMARY JUDGMENT ON HOME'S CONTRIBUTION CLAIM ...........................................1257
 A. PRO RATA SHARE .......................................1258
 B. REASONABLENESS OF THE $7.5 MILLION SETTLEMENT ........................1258
VII. WHAT EVIDENCE MAY HOLMES' PRESENT AT TRIAL IN AN ATTEMPT TO ESTABLISH THE UNREASONABLENESS OF THE $7.5 MILLION SETTLEMENT? ...........................................1259
RECOMMENDATION ........................................................1259
OBJECTIONS ..............................................................1259

The Holmes Organisation, Inc.'s ("Holmes") motion for summary judgment is now before the Court. [Doc. No. 247]. Holmes' motion has been referred to the undersigned for a Report and a recommendation pursuant to 28 U.S.C. § 636 and Fed.R.Civ.P. 72. The undersigned heard oral argument on Holmes' motion at a hearing on May 15, 2000. With its motion, Holmes seeks summary adjudication of Counts I and II in Plaintiff's "Second Amended Third–Party Complaint."[1]

---

1. Holmes' motion for summary judgment was originally directed to Counts I and II of Plaintiff's "First Amended Third Party Complaint." [Doc. No. 188]. After briefing on Holmes' motion for summary judgment was complete, Judge Michael Burrage granted The Home Indemnity Company's ("Home") motion for leave to amend, and Home filed its Second

[Doc. No. 260]. For the reasons discussed below, the undersigned recommends that Holmes' motion for summary judgment be DENIED.

## I. FACTUAL/PROCEDURAL SUMMARY[2]

### A. THE RELATIONSHIP BETWEEN HOME, HARBOR, HOLMES AND COOPER

Home is a New Hampshire corporation in the business of underwriting insurance policies. Holmes is an Oklahoma corporation in business as a broker for the purchase and sale of insurance policies. At all relevant times, Holmes was an authorized broker/agent for Home. *See* Doc. No. 277, Exhibit "14." Holmes acted as Home's agent in connection with the sale, payment, performance, cancellation and other matters regarding insurance policies written by Home in Oklahoma.

At all relevant times, Kent A. Bogart was the president of Holmes. Beginning in 1979, Holmes became an insurance agent for Cooper Manufacturing Corporation ("Cooper"), providing Cooper with various forms of insurance coverage. As Cooper's agent, Holmes routinely received notices and demands from Cooper and transmitted them to Home in connection with Cooper's insurance policies. All parties agree that during the relevant period, Holmes was the dual agent of Cooper and Home.

By the late 1970's and early 1980's, Cooper had established itself as a prominent manufacturer and supplier of workover drilling rigs. A workover drilling rig consists of a steel derrick or mast, mounted on a mobile truck or carrier. From 1979 through October 1984, George Hug was the Chief Financial Officer and Risk Manager for Cooper, and Jon Barton was Cooper's President and Chief Executive Officer. Mr. Hug handled Cooper's insurance matters.

Cooper's primary insurance coverage consisted of comprehensive general liability ("CGL") policies purchased from Home through Holmes, Home's authorized agent.[3] Cooper obtained secondary insurance coverage through umbrella and excess liability ("UEL") policies purchased from Harbor Insurance Company ("Harbor") through Holmes. When a claim arose against Cooper which was potentially covered by one of its CGL or UEL policies, Mr. Hug would routinely forward the relevant claim information to Holmes with a transmittal letter.

### B. COOPER DISCOVERS DEFECTIVE STEEL IN ITS WORKOVER RIGS.

In early 1984 Cooper discovered that certain of its workover rigs had been manufactured with defective steel purchased from several suppliers, including Babcock & Wilcox ("B & W").[4] This discovery immediately raised the issue of whether Cooper had insurance coverage for any potential claims related to defective work-

---

Amended Third Party Complaint on March 24, 2000. The second amended complaint adds Kent Bogart as a named party and adds two new counts—Counts III and IV—against Holmes and Mr. Bogart. The first two counts in the Second Amended Third Party Complaint are, however, the same as the two counts originally pled in the First Amended Third Party Complaint. The undersigned finds, therefore, that Holmes' motion for summary judgment is now directed at the first two counts in Home's Second Amended Third Party Complaint. This Report and Recommendation will, therefore, only address Counts I and II of the Second Amended Third Party Complaint. Counts III and IV in the Second Amended Third Party Complaint will not be addressed herein.

2. The undersigned finds no genuine issue of material fact with regard to the facts summarized in this section. *See* Fed.R.Civ.P. 56(d).

3. In 1979, Mr. Bogart, Cooper's insurance agent, presented to Mr. Hug, Cooper's risk manager, a new type of insurance coverage described as product recall and/or product warranty coverage. Cooper considered purchasing the new insurance, but ultimately decided against purchasing it.

4. *See* Judge Wilson's May 29, 1996 Order, Doc. No. 249, Exhibit "24," pp. 7–8, for a description of the steel defect.

over rigs sold by Cooper. On May 18, 1984, Mr. Barton, as Cooper's President, sent a letter to Cooper's customers advising them of the defective steel in Cooper's rigs. *See* Doc. No. 249, Exhibit "10." This May 18th letter has become known as the "Dear Customer" or "Warning" letter.

On the same day that Cooper mailed its Dear Customer letter, Mr. Hug, Cooper's risk manager, met with Mr. Bogart, Holmes' president, to discuss the defective workover rigs. What was or was not said, at this meeting is disputed. It is undisputed, however, that Mr. Hug provided Mr. Bogart with a copy of Cooper's Dear Customer letter.

A day or two after meeting with Mr. Hug, Mr. Bogart met with Mike Heard, a Tulsa-based underwriter for Home. Mr. Bogart gave Mr. Heard a copy of Cooper's Dear Customer letter and they discussed it. Mr. Heard had further questions regarding the situation, so, in Mr. Bogart's presence, Mr. Heard called Mr. Hug and spoke further with him about Cooper's predicament. Mr. Heard then gave a copy of Cooper's Dear Customer letter to Glenn Hogg, Home's Tulsa-based claims supervisor. Sometime during 1984, William Flynn, a claims manager for Holmes in Tulsa, and Wayne Fletcher, a claims manager for Home in Tulsa, also discussed Cooper's Dear Customer letter.

## C. Cooper, Facing Numerous Product Liability Lawsuits For Selling Defective Workover Rigs, Files For Bankruptcy.

Cooper's warning letter provoked numerous claims against Cooper. On June 15, 1984, WellTech, Inc. ("WellTech"), a major buyer of Cooper's rigs, filed suit against Cooper and B & W in Texas. Due to the defective rigs it had purchased from Cooper, WellTech sought damages for lost profits, transportation costs, storage costs, equipment costs, loss of business, loss of market share and loss of good will. Doc. No. 249, Exhibit "19." On June 21, 1984, Pride Oil Well Service Company ("Pride"), another major purchaser of Cooper's rigs, also sued Cooper and B & W in Texas and sought damages similar to those sought by WellTech. *Id.* at Exhibit "22." The WellTech and Pride lawsuits were eventually consolidated and the parties commonly refer to these lawsuits as the Texas litigation. Throughout 1984 and 1985, Cooper and B & W were sued numerous other times by numerous other purchasers of Cooper's workover rigs. *See* Doc. No. 249, Exhibit "24," pp. 11–15 for a list of claims eventually filed against Cooper.

On July 13, 1984, Cooper filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in this district. The bankruptcy court found that Cooper filed for bankruptcy protection due to the contingent liability posed by all potential claims related to the defective workover rigs it had sold.[5] On July 16, 1984, the claims managers in Tulsa for Home and Holmes, Mr. Flynn and Mr. Fletcher respectively, became aware of Cooper's bankruptcy filing. Cooper's bankruptcy filing received media coverage in the Tulsa area, and Mr. Heard, Home's Tulsa-based underwriter, recalls seeing articles about Cooper's bankruptcy. On July 24, 1984, Michael R. Sander, a claims representative for Home, prepared and forwarded an internal memo to Mr. Fletcher, discussing Cooper's bankruptcy and enclosing a newspaper article discussing the fact that Cooper had elected to file bankruptcy because of numerous claims and lawsuits.

On December 4, 1985, the bankruptcy court confirmed Cooper's Plan of Reorga-

---

5. Doc. No. 249, Exhibit "24," p. 15. Cooper also sent a letter to its vendors notifying them of Cooper's bankruptcy filing. The letter contained the following language: "A number of Cooper's customers have sought remedy through litigation. We expect others to follow. It is virtually impossible to determine the overall magnitude of potential claims or the legal expense associated with them." Doc. No. 249, Exhibit "23." The bankruptcy judge found that Cooper had forwarded a copy of this letter to Holmes, and that Holmes in turn forwarded a copy of the letter to Home and Harbor or Harbor's broker.

nization, which provided for the liquidation of Cooper through a liquidating trust. Assets of the trust included Cooper's claims against B & W, and any rights Cooper had under any insurance policies with Home or Harbor. "The gist of the plan [was] that any recovery of money from these assets [would] be distributed to Cooper's creditors, consisting principally of Pride, WellTech, and the other [defective mast] claimants." Doc. No. 249, Exhibit "24," p. 16. On January 29, 1986, Mr. Barton, Cooper's former president, was appointed as trustee of the liquidating trust.

In 1987 WellTech and Pride amended their petitions in the Texas actions to allege claims for loss of use of, or damage to, collateral property (i.e., property other than the Cooper rig itself). *See* Doc. No. 250, Exhibit "35." Ultimately, Pride and WellTech sought damages for mast inspection costs, rig stacking and unstacking costs, mast repair costs, replacement rig costs, loss of use of stacked masts, loss of use of stacked carriers, loss of use of collateral property, loss of gross margin, administrative costs, attorney's fees and punitive damages. Later in 1987, WellTech and Pride settled their lawsuits by taking money from B & W and assigning their claims against Cooper to B & W. Pursuant to the assignment agreement, B & W was permitted to enforce its Pride and WellTech claims against Cooper only to the extent of Cooper's insurance coverage, if any.

Cooper and B & W then moved toward settlement of the claims as between themselves. On October 28, 1987, Mr. Barton, as Cooper's trustee, signed a settlement agreement with B & W. This agreement was approved by the bankruptcy court at a hearing on December 22, 1987. Doc. No. 249, Exhibit "24," pp. 19–20. Pursuant to the agreement, Cooper's liquidating trust received $18 million, which was distributed to Cooper's creditors pursuant to the Plan of Reorganization.

### D. Cooper's Coverage Case In The Bankruptcy Court

On November 12, 1993, Mr. Barton, as bankruptcy Trustee for Cooper, filed an adversary proceeding in the bankruptcy court against Home and Harbor. As Trustee, Mr. Barton sought a declaratory judgment that Cooper's CGL and UEL policies were property of the liquidating trust; that the policies provided Cooper with coverage for any claims arising out of the design, manufacture or sale of the workover rigs; and that Home and Harbor had a duty to defend Cooper against any such claims. Doc. No. 250, Exhibit "39."

In March 1994, the bankruptcy court determined by summary judgment that the Home and Harbor policies were owned by Cooper at the commencement of Cooper's bankruptcy; that the policies were property of Cooper's bankruptcy estate; and that by the terms of Cooper's confirmed plan, the policies were transferred to, and were a part of, the liquidating trust established by the plan. The bankruptcy court then held a bench trial in February 1995 to determine whether any of the policies in Cooper's liquidating trust provided coverage for any claims relating to Cooper's defective workover rigs. The bankruptcy court concluded that, except for damages relating to replacing the mast itself (excluded pursuant to an "own product" exclusion), the Home and Harbor policies provided coverage for the types of damages Pride and WellTech had been seeking in their lawsuits. Doc. No. 249, Exhibit "24," p. 37.

### E. *The Underlying Bad Faith Case In This Court*

On September 12, 1994, Mr. Barton, as Cooper's bankruptcy trustee, filed an adversary proceeding in the bankruptcy court against Home and Harbor. Cooper asserted claims for common law bad faith and violations of the Texas Insurance Code. The Court's standing reference to the bankruptcy court was withdrawn and Cooper's complaint was transferred to this

Court's docket. Cooper alleged that Home's and Harbor's failure to investigate and defend Cooper with regard to the claims resulting from the defective rigs forced Cooper into bankruptcy and caused Cooper's death as a company. As damages, Cooper sought the lost value of Cooper as a going concern, punitive damages, treble damages for the statutory violations, interest and attorney's fees. Cooper's damages expert valued Cooper's "death of the company" claim, plus interest, from $55 million (applying Oklahoma law) to $86 million (applying Texas law), without considering. trebling or punitive damages. *See* Doc. No. 277, Exhibit "4." Cooper also alleged that once Home and Harbor actually began to defend Cooper in the Pride and WellTech cases, Home and Harbor committed several acts of bad faith. *See* Doc. Nos. 105 and 106 (for a description of the underlying Cooper/Home litigation).

On February 18, 1997, Cooper and Home settled all of Cooper's claims against Home, and a settlement agreement was executed on March 4, 1997. Pursuant to the settlement agreement, Home paid Cooper $7.5 million. *See* Doc. No. 277, Exhibit "26." The $7.5 million settlement was approved by the bankruptcy court on March 18, 1997. As part of the settlement, Home obtained a release from Cooper which not only released Home from all liability to Cooper, but also released Holmes from all liability to Cooper. The $7.5 million settlement settled all of Home's liability which remained in the coverage case before Bankruptcy Judge Wilson; all liability for Home's alleged delay in defending Cooper against the defective rig claims, which Cooper alleged was the cause of Cooper's bankruptcy and liquidation; and all liability for Home's alleged bad faith conduct once it began to defend Cooper against the defective rig claims in the Texas litigation.

### F. Home's Indemnity And Contribution Claims Against Holmes

In October 1996, several months prior to Home's $7.5 million settlement with Cooper, Home filed a motion for leave to amend its Answer in this case to allege a third party claim for indemnity and contribution against Holmes. Doc. No. 123. In March 1997, a month after Home's settlement with Cooper, the Court granted Home's motion and Home filed its original Third Party Complaint against Holmes, which has been amended twice. *See* Doc. Nos. 156, 157, 188 and 260. Home asserts the following claims against Holmes in Counts I and II of its Second Amended Third Party Complaint:

**Count I**—Home alleges that Holmes was its agent and that by its acts and omissions Holmes caused Home to be vicariously liable to Cooper. Home alleges that any breach of its duty to defend Cooper was caused by the "the active, primary negligence and breach of duties to Home by [Holmes]." Doc. No. 260, p. 14. Consequently, Home demands Indemnity from Holmes for all amounts paid by Home to Cooper.

**Count II**—Alternatively, Home alleges that with respect to Cooper, Holmes is a joint tortfeasor. Home alleges that, through its acts and omissions, Holmes breached duties it owed to Cooper, which rendered Holmes liable in tort to Cooper. Home alleges, therefore, that Holmes is liable to Cooper for the same injuries and losses for which Home was liable to Cooper. Because Home settled Cooper's claims, extinguishing Home and Holmes' liability to Cooper, Home demands contribution from Holmes "in the proportion of [Holmes'] fault and liability, for all amounts paid by Home to settle [Cooper's] claims against Home . . . ." Doc. No. 260, p. 15.

### 1. Prior Appeal to the Tenth Circuit

The Court previously granted summary judgment in favor of Holmes on Home's original Third Party Complaint. Doc. No. 175. Regarding Home's indemnity claim, the Court held that to recover for indemnity from Holmes under Oklahoma law, Home would have to show that Holmes was directly liable to Cooper. The Court then found that because Holmes owed no

direct duties to Cooper, and because Home could not delegate to Holmes the duties it owed to Cooper, Home could not establish that Holmes was directly liable to Cooper. Doc. No. 175.

Home appealed the Court's dismissal of its indemnity claim, arguing that the Court construed the law of indemnity too narrowly. The Tenth Circuit agreed and reversed. *Home v. Holmes*, No. 98–5080, 1999 WL 360173, at *2 (10th Cir. Jun. 4, 1999). The Tenth Circuit held that in order to recover indemnification, an indemnitee (Home) need not establish direct liability between the indemnitor (Holmes) and the party to whom the indemnitee (Home) was liable (Cooper). According to the Tenth Circuit, an indemnitee (Home) may seek indemnification by establishing that the indemnitor's (Holmes') acts directly caused the indemnitee (Home) to become liable to a third party (Cooper). *Id.* Noting that Home was alleging that Holmes' acts and omissions directly caused Home's potential liability to Cooper, the Tenth Circuit held that Home's indemnity claim should not have been dismissed. *Id.*

Regarding Home's contribution claim, this Court previously held that contribution in Oklahoma is premised on a finding that two parties are joint tortfeasors with respect to an injured party, and that one joint tortfeasor has paid more than his *pro rata* share. Following its holding with regard to Home's indemnity claim, the Court held that Holmes could not be a joint tortfeasor because Holmes could not be directly liable to Cooper. Doc. No. 175.

Home appealed the Court's dismissal of its contribution claim, and the Tenth Circuit reversed. *Home*, 1999 WL 360173, at *2. The Tenth Circuit held that Holmes could potentially be liable to Cooper on a dual agency theory. That is, Home alleged Holmes was an agent of both Cooper and Home, and that Holmes violated duties it owed to Cooper as Cooper's agent. Citing *Home Ins. Co. v. Southern Motor Coach Corp.*, 171 Okla. 94, 41 P.2d 870 (1935), the Tenth Circuit found that such a dual agency was not precluded by Oklahoma law on the facts of this case. The court concluded, therefore, that Home's contribution claim should not have been dismissed.

### 2. Current Motion for Summary Judgment

This case was remanded by the Tenth Circuit in July 1999. Since that time, discovery has proceeded on Home's indemnity and contribution claims against Holmes. Holmes again moves for summary judgment on Home's indemnity and contribution claims. Holmes now argues that Home's indemnity claim must fail as a matter of law because Home, as a party seeking indemnity, must be without actual fault, and Home was directly liable to Cooper, not just vicariously liable to Cooper. Holmes also argues that Home, as a party seeking contribution, is only entitled to recover the amount which it paid in excess of its *pro rata* share of liability to Cooper, and Home is not permitted to recover for any amount paid which was in excess of what was reasonable. Holmes argues that Home's contribution claim fails as a matter of law because there is no evidence that Holmes was at fault (i.e., Home's *pro rata* share is 100% and Holmes is 0%), and because the $7.5 million settlement paid to Cooper was *per se* unreasonable.

## II. SUMMARY JUDGEMENT STANDARDS

A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court will find no genuine issue of triable fact if it determines that the summary judgment record taken as a whole could not lead a rational trier of fact to find for Plaintiff. Because Plaintiff will bear the burden of proof at trial, Plaintiff must go beyond its pleadings and identify specific facts which establish the existence of each element essential to its case. Defendant need only point to an absence of evidence to support a single element of Plaintiff's case. The court

must, however, resolve all doubts in favor of Plaintiff, the non-moving party. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Conaway v. Smith*, 853 F.2d 789, 792 n. 4 (10th Cir. 1988); *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir.1980).

## III. CHOICE OF LAW

In briefing Holmes' motion for summary judgment, the parties have relied primarily on Oklahoma's law of indemnity and contribution. However, in its brief, Holmes states that it "does not intend to waive its argument that Texas law may ultimately apply in this case." Doc. No. 248, p. 28 n. 23. At the May 15th hearing on Holmes' motion, the undersigned asked Holmes to either present its arguments regarding the application of Texas law to this case or cease reliance on the application of Texas Law. Counsel for Holmes stated at the hearing that Holmes now agrees that Oklahoma, and not Texas, law should be applied to Home's indemnity and contribution claims. The undersigned will, therefore, apply Oklahoma law to Counts I and II of Home's Second Amended Third Party Complaint. *See, e.g., Home v. Holmes,* No. 98–5080, 1999 WL 360173, at *1 (10th Cir. Jun. 4, 1999) (where the Tenth Circuit applied Oklahoma law to Home's indemnity and contribution claims); and *Gay & Taylor, Inc. v. St. Paul Fire & Marine Ins. Co.*, 550 F.Supp. 710, 714 (W.D.Okla. 1981) (applying Oklahoma law to claims similar to those asserted by Home in this case).

## IV. COUNT I—THERE ARE MATERIAL QUESTIONS OF DISPUTED FACT WHICH PRECLUDE THE ENTRY OF SUMMARY JUDGMENT ON HOME'S INDEMNITY CLAIM.

There is no evidence in the record of an express indemnity contract running from Holmes to Home. Holmes argues that Home's indemnity claim is premised on the agency agreement entered into by Home and Holmes in April 1981. *See* Doc. No. 277, Exhibit "14." The only indemnification obligation in the agency agreement runs from Home to Holmes. That is, paragraph 13 of the agency agreement contractually obligates Home to indemnify Holmes in certain circumstances. *Id.* The agreement imposes no express obligation on Holmes to indemnify Home. The undersigned finds, therefore, that Home's indemnity claim is based on the common law, and not on an express contractual agreement.

A quasi-contract, constructive contract, or an implied-in-law contract should not be confused with an implied contract. An implied contract is an actual contract created by the parties' own conduct which establishes a mutual intent to form a contract—one implied by the facts. A quasi-contract or a contract implied-in-law is no contract or promise at all. Quasi-contracts are obligations imposed by operation of law regardless of the parties' conduct or true intent. These legal obligations are often imposed by courts through the fiction of an involuntary promise. It is the use of such a fiction that creates confusion between quasi-contracts and implied contracts. *See Booker v. Sears Roebuck & Company,* 785 P.2d 297, 300–303 and 308 n. 13 (Okla.1989) (Summers, J., concurring, and Opala, J., dissenting) "A quasi contract is not a contract, and the substantive law of contracts is not applicable because liability is not based on an agreement between the parties. Instead, liability is based on a duty which is imposed by law." *Id.* at 301 n. 3 (citing G. Fraser, *Contracts, Quasi Contracts, and Pleadings,* 27 Okl. L.Rev. 440, 441 (1974)). The undersigned finds that Home's indemnity claim is based on a quasi-contract, not an implied contract, theory.

"The right to indemnity is not limited to cases where there is an express agreement to that effect. A right to im-

plied indemnity may arise out of a contractual or a special relationship between parties and from equitable considerations." *Daugherty v. Farmers Cooperative Ass'n,* 790 P.2d 1118, 1120 (1989). Holmes does not dispute that an implied-in-law indemnity obligation could arise out of the agency relationship between itself and Home. *See, e.g., Braden v. Hendricks,* 695 P.2d 1343, 1349–50 (Okla.1985) (recognizing manufacturer's implied indemnity obligation to its dealer); *National Union Fire Ins. Co. v. A.A.R. Western Skyways, Inc.,* 784 P.2d 52, 54 (Okla.1989); and *Central Nat. Bank of Poteau v. McDaniel,* 734 P.2d 1314, 1316 (1986). Rather, Holmes attacks the elements of Home's implied indemnity claim under Oklahoma law.

### A. Home's Fault

■ The parties agree that in Oklahoma "[i]n the case of implied or noncontractual indemnity, the right rests upon fault of another which has been imputed or constructively fastened upon he who seeks indemnity." *Daugherty,* 790 P.2d at 1120. Oklahoma recognizes "a right of indemnity when one—who was only *constructively* liable to the injured party and was in no manner responsible for the harm—is compelled to pay damages because of the tortious act by another." *Braden,* 695 P.2d at 1349 (citing several cases) (emphasis original). Thus, to seek indemnification, a party cannot have been actively at fault. *Travelers Ins. v. L.V. French Truck Service,* 770 P.2d 551, 555 n. 16 (Okla.1988); *Porter* v. *Norton–Stuart Pontiac–Cadillac of Enid,* 405 P.2d 109, 111 (1965).

Holmes argues that it is entitled to summary judgment on Home's implied indemnity claim because the record contains undisputed evidence which establishes that at least some portion of the $7.5 million settlement is attributable to Home's own, active fault. Holmes' argument is similar to that made by the defendant in *Biggs v. Surrey Broadcasting Co.,* 811 P.2d 111, 114–15 (1991). In *Biggs,* a Mr. Biggs and a Ms. Kelly worked for a radio station in Oklahoma City. Ms. Kelly sued the radio station, seeking to hold it liable for alleged sexual harassment by her fellow employee, Mr. Biggs. The radio station eventually settled Ms. Kelly's sexual harassment claim. The radio station then sued Mr. Biggs for indemnity. Mr. Biggs moved for summary judgment on the station's indemnity claim, arguing that the station was partially at fault because the station management was affirmatively involved in the wrongful acts complained about by Ms. Kelly. The court reviewed the record and disagreed with Mr. Biggs. The court found that the station had no active fault because the station management had promptly responded to Ms. Kelly's complaints and reprimanded Mr. Biggs. Because the station had no active fault, the court held that the station was entitled to pursue an implied-in-law indemnity claim against Mr. Biggs, *Id.*

This Court must perform the same analysis as the court in *Biggs.* The Court must review the record to determine if there is any evidence from which a reasonable jury could conclude that Home was not at fault with regard to the liability for which it seeks indemnification. If a reasonable jury could conclude that Home was without active fault as to Cooper, then summary judgment on Home's implied indemnity claim is not appropriate. If, however, the record evidence is so one sided that no reasonable jury could conclude that Home was without fault, summary judgment is appropriate.

As was discussed above, the $7.5 million settlement paid by Home to Cooper extinguished three types of liability which Home faced: (1) the liability Home faced in the bankruptcy coverage case, (2) the liability Home faced for delaying its defense of Cooper and causing Cooper's bankruptcy and liquidation, and (3) the liability Home faced for its bad faith conduct once it began to defend Cooper in the Texas litigation. Home admits that at least some portion of the $7.5 million settlement is attributable to each liability category (i.e., coverage, failure to defend and bad faith). Home argues, however, that

the largest share of the settlement is properly attributable to the liability it faced for allegedly causing Cooper's bankruptcy and liquidation by delaying its defense of Cooper.

In its Second Amended Third Party Complaint, Home seeks indemnity from Holmes "for all amounts paid by Home to [Cooper] to settle [Cooper's] claims against Home . . . ." Doc. No. 260, p. 14. However, in its response to Holmes' motion for summary judgment, Home now limits its indemnity claim to that portion of the $7.5 million settlement which is attributable to Home's liability to Cooper for causing Cooper's bankruptcy and liquidation by delaying its defense of Cooper against the defective rig claims. Holmes has offered no argument as to why Home should not be permitted to limit its indemnity claim in this manner.

Home admits that it will have the burden at trial of establishing precisely how the $7.5 million settlement should be apportioned. *See, e.g., Gay*, 550 F.Supp. at 716. Home also admits that it is not entitled to indemnification from Holmes for any portion of the $7.5 million which is attributable to liability for coverage and liability for Home's own bad faith once it began to defend Cooper. Home argues, however, and the undersigned agrees, that how the $7.5 million settlement should ultimately be apportioned as between liability for coverage, failure to defend prior to Cooper's bankruptcy and bad faith after Cooper's bankruptcy is a question for the jury. There is insufficient evidence in the summary judgment record, let alone undisputed evidence, from which the Court could, as a matter of law, make such an apportionment.

Home argues that with respect to any liability it faced for delaying its defense of Cooper and causing Cooper's bankruptcy and liquidation, that liability was passive. Home argues that it was without fault for failing to defend Cooper prior to Cooper's bankruptcy, and that it was only liable to Cooper because of the conduct of its agent, Holmes. Home argues that Holmes is at fault for Home's pre-bankruptcy failure to defend Cooper because Holmes breached its duty as Home's agent to discover and notify Home that there were claims against Cooper which needed to be defended, and because Holmes, through Mr. Bogart, gave Cooper an unauthorized "no coverage" opinion.

### 1. Holmes' Alleged Failure to Notify Home of Claims Against Cooper

■ Home argues that after Cooper issued its May 18, 1984 Warning letter, Holmes failed to monitor the situation with Cooper and report to Home claims like those asserted in the *Pride* and *WellTech* cases. Holmes argues that if it is at fault for failure to identify claims against Cooper, Home is also at fault because it was privy to the same information to which Holmes was privy. Home argues in response that, while this may ordinarily be true, in this case Home had an agreement with Holmes that Holmes would monitor the situation and forward additional claims information to Home. Home cites to testimony from William Flynn to support its argument. *See* Doc. No. 277, Exhibit "18."

It is undisputed that sometime in 1984 Mr. Flynn, a claims supervisor for Holmes, and Wayne Fletcher, a claims manager for Home, received a copy of and discussed Cooper's May 18th Warning letter. Home argues that during their conversation about the May 18th Warning letter, Mr. Fletcher from Home communicated to Mr. Flynn from Holmes that he did not understand the May 18th letter to be a claim because the letter simply notified Cooper's customers that they might have defective steel in their workover rigs. According to Home, Mr. Flynn and Mr. Fletcher agreed during their conversation that Holmes would monitor the situation for Home and let Home know if true claims did arise out of the May 18th Warning letter. Home argues that it relied on this agreement and waited to be notified of claims by either Cooper or Holmes, and it is undisputed that neither Cooper nor Holmes notified

Home of any defective rig claims prior to Cooper's bankruptcy. Home argues, therefore, that it had no fault for failing to defend Cooper prior to Cooper's bankruptcy because Home had no notice of any claims prior to Cooper's bankruptcy.

The undersigned finds that factual issues permeate Home's "failure to notify" theory of liability. There are disputed issues regarding what Home and Holmes knew and when each knew what they did know about claims against Cooper. There are also questions of fact about the "agreement," if there was one, between Mr. Fletcher and Mr. Flynn. In short, the undersigned finds that a reasonable jury could find that it was Holmes' failure to monitor the situation and bring claims to Home's attention which caused Home to fail to defend Cooper prior to Cooper's bankruptcy.

### 2. Holmes'/Mr. Bogart's "No Coverage" Opinion

Home argues that but for Mr. Bogart's conduct as Holmes' president, Home would have had an affirmative defense to Cooper's claim that Home's failure to defend Cooper caused Cooper's bankruptcy and liquidation. Home initially defended against Cooper's claim by arguing that Home never had a duty to defend Cooper because Cooper never tendered any defective rig claims to Home for defense. In response, Cooper argued that Home was estopped from asserting a "no tender" defense because Mr. Bogart, acting as Home's agent, had previously told Cooper that Cooper's policies with Home did not provide coverage for the claims being asserted against Cooper for its use of defective steel in its workover rigs. Cooper argued that the reason it never tendered any claims to Home was because of this "no coverage" opinion rendered by Home's own agent. Home argues that it was due in significant part to the potential loss of its affirmative "no tender" defense that it decided to settle with Cooper for $7.5 million. Thus, Home argues that its liability to Cooper was wholly caused by Mr. Bogart's unauthorized "no coverage" opinion.

Home argues that had Mr. Bogart's "no coverage" opinion not been rendered, Home would have had a complete "no tender" defense to liability for failing to defend Cooper.

According to Home, Mr. Bogart rendered his "no coverage" opinion to Mr. Hug, Cooper's CFO, during their May 18, 1984 meeting at which Mr. Hug and Mr. Bogart discussed Cooper's Warning letter, Home also argues that Mr. Bogart confirmed his "no coverage" opinion in subsequent conversations he had with Mr. Barton, Cooper's president. The undersigned finds that it is undisputed that Mr. Bogart rendered some form of "no coverage" opinion. What is hotly disputed by the parties is the scope of the no coverage opinion actually rendered by Mr. Bogart.

Holmes argues that the only coverage opinion rendered by Mr. Bogart was an opinion similar to that issued by Bankruptcy Judge Wilson—that warranty-type claims for damage to the workover rigs themselves would not be covered (i.e., product liability coverage similar to that which was offered to and rejected by Cooper in 1979), but that claims for personal injuries or damage to other property would be covered in the event of a rig collapse. Home argues that Mr. Bogart's coverage opinion was much more open-ended.

The entire "no coverage" opinion issue revolves entirely around the testimony of Mr. Hug, Cooper's CFO, Mr. Bogart, Holmes' president, and Mr. Barton, Cooper's president. Holmes argues that the Court must not consider Mr. Barton's testimony because if a no coverage opinion was rendered by Mr. Bogart it was rendered at his May 18th meeting with Mr. Hug and Mr. Barton was not present. Holmes argues, therefore, that Mr. Barton cannot testify about any coverage opinion rendered by Mr. Bogart. The undersigned does not agree. Mr. Barton has testified that he had conversations with Mr. Bogart himself in which Mr. Bogart confirmed his "no coverage" opinion, what-

ever that opinion was. Mr. Bogart's own testimony on this issue has itself "evolved" over time from a "no specific recollection" during the bankruptcy coverage case to a "specific recollection" in this case. Needless to say, there are credibility assessments which must be made with regard to Mr. Bogart's testimony.

The undersigned finds, therefore, that there are material questions of disputed fact throughout the Bogart "no coverage" opinion issue. The undersigned finds that a reasonable jury could conclude that by issuing a coverage opinion of any kind, which he was not authorized to do,[6] Mr. Bogart created the opportunity for confusion regarding the coverage issue and opened the door for a claim such as Cooper ultimately made—that a general no coverage opinion had been rendered. A reasonable jury could find, therefore, that it was Holmes' unauthorized "no coverage" opinion which deprived Home of a valid "no tender" defense and caused Home to be liable to Cooper for failing to defend Cooper prior to its bankruptcy.

### 3. Conclusion

The only legal, as opposed to fact-based, argument Holmes makes against its liability for indemnity to Home is that Holmes' acts, as an agent of Home, cannot be imputed to Home to establish bad faith. Holmes cites *Hays v. Jackson National Life Ins. Co.*, 105 F.3d 583 (10th Cir.1997), which applies Oklahoma law, in support of its argument. Holmes argues that pursuant to the holding in *Hays*, Cooper would have been precluded in the underlying bad faith case from using Holmes' conduct as the basis of an estoppel against Home. The undersigned does not agree.

In *Hays* a life insurance company denied a claim filed by an insured's beneficiaries. The company denied the claim because it believed the insured's application contained material omissions about his medi-

cal history. The beneficiaries sued the insurance company for breach of contract and bad faith denial of their claim, arguing in part that the employee that solicited the policy was aware of the omitted medical information. The insurance company moved for and was granted summary judgment on the bad faith claim. The beneficiaries defended the motion by arguing that there were questions of fact about how the company's employee solicited the policy from the insured and what the employee knew or did not know about the insured's medical condition. *Hays*, 105 F.3d at 583–590.

On appeal, the Tenth Circuit in *Hays* held that the conduct of the employee that solicited the policy was not relevant to the beneficiaries' bad faith claim. The court held the beneficiaries' bad faith claim was necessarily based on the company's wrongful denial of the claim, and not on the company's conduct in selling the policy. The Court concluded, therefore, that how the employee acted when he solicited the policy was not relevant to whether the company acted tortiously when it disputed the beneficiaries' claim. The court concluded its analysis by holding that "[u]nder Oklahoma law, the alleged knowledge and acts of the agent at the time of the application is not imputed to the principal for purposes of determining whether the principal acted in bad faith." *Hays*, 105 F.3d at 590. This is the holding upon which Holmes relies.

 The undersigned finds that the Tenth Circuit's holding in *Hays* does not provide a basis upon which to grant summary judgment on Home's implied indemnity claim. Initially, the undersigned is not convinced that *Hays*, and the cases on which it relies, are applicable outside of their specific factual situations (i.e., attempts by insureds to impute to the insur-

---

**6.** Citing to ¶ 11 of the parties' agreement, Home argues that Holmes was not authorized by Home to render coverage opinions with regard to any of Home's policies. *See* Doc. No. 277, Exhibit "14." Holmes was

authorized to solicit business, collect premiums and forward claims. According to Home, Holmes violated its agency agreement with Home when Mr. Bogart issued a coverage opinion of any kind.

er an agent's subjective knowledge about a medical condition of the insured which is not on the insurance application). More importantly, there is nothing in *Hays* which suggests that an insured may not use the conduct of an insurer's agent to estop the insurer from asserting an otherwise valid defense.[7] Estoppel is based on the rules of equity and *Hays* in no way addresses itself to equitable concerns.

Holmes' exclusive reliance on *Hays* is also misplaced in light of Judge Burrage's previous determination that Texas law would apply to the bad faith action between Home and Cooper. *See* Doc. No. 106. Citing Oklahoma law on the issue of what Cooper would or would not have been able to assert in the underlying bad faith case is not controlling. As revealed by the previous footnote, the undersigned's cursory review of Texas law reveals that Texas does permit insureds to use the conduct of an insurer's agent as the basis for an estoppel. *See, e.g., Cook v. Smith*, 673 S.W.2d 232, 235 (1984). At a minimum, the legal viability of Cooper's estoppel claim was uncertain enough to permit a jury to conclude that it was reasonable for Home to settle in the face of the potential loss of an otherwise valid "no tender" defense.

The undersigned finds that Home has presented at least some evidence from which a reasonable jury could conclude that Holmes, and not Home, was responsible for Home's pre-bankruptcy failure to defend Cooper. Consequently, summary judgment on Home's implied indemnity claim on the basis of Home's fault is not appropriate.

## V. COUNT I—HOME NEED ONLY ESTABLISH POTENTIAL, NOT ACTUAL, LIABILITY TO COOPER FOR ITS ALLEGED PRE–BANKRUPTCY FAILURE TO DEFEND COOPER.

### A. THE RULE—AN INDEMNITEE MAY SETTLE THE INJURED PARTY'S CLAIM AND SEEK INDEMNIFICATION FROM A PUTATIVE INDEMNITOR WITHOUT HAVING TO ESTABLISH ITS ACTUAL LIABILITY TO THE INJURED PARTY AS LONG AS THE INDEMNITOR WAS ON NOTICE OF THE INJURED PARTY'S CLAIM AND GIVEN AN OPPORTUNITY TO PARTICIPATE IN SETTLEMENT NEGOTIATIONS AND OBJECT TO THE SETTLEMENT.

■ The parties disagree as to the elements of Home's indemnity claim under the facts of this case. Home argues that in order to prevail on its indemnity claim it need only establish three facts: first, that it was potentially liable to Cooper; second, that its potential liability to Cooper was caused by Holmes' conduct; and third, that its settlement of the potential liability for $7.5 million was reasonable. Holmes argues, on the other hand, that Home must, in effect, step into Cooper's shoes and prove that Home was actually liable to Cooper for a specified sum. The issue presented by the parties' arguments is this: Must Home establish that it was actually liable to Cooper, or is Home only required to establish that it was potentially liable to Cooper?

Based on the undersigned's independent research and a review of all of the cases cited by the parties, the undersigned finds that requiring proof of actual liability is the general rule, from which a "potential liability exception" may be made after

---

7. *See, e.g., Celina Mutual Ins. Co. v. Citizens Ins. Co. of America*, 133 Mich.App. 655, 349 N.W.2d 547, 551 (1984); *Florio v. General Acc. Fire & Life Assur. Corp.*, 396 F.2d 510, 514 (2nd Cir.1968); *Cook v. Smith*, 673 S.W.2d 232, 235 (1984); *Roberts v. Maine Bonding and Cas. Co.*, 404 A.2d 238, 242–43 (Me.1979); *Nationwide Mut. Ins. Co. v. Regional Elec. Contractors, Inc.*, 111 Md.App. 80, 680 A.2d 547 (1996); and *Patriot General Ins. Co. v. Millis*, 233 Ga.App. 867, 506 S.E.2d 145, 147–48 (1998). In all of these cases, the court permitted the insured to use the conduct of the insurer's agent to estop the insurer from asserting an otherwise valid defense (e.g., statute of limitations, no coverage, etc.).

weighing the policy interests in encouraging settlements against considerations of fairness to putative indemnitors. *See, e.g., Frederick v. Hess Oil V.I. Corp.*, 642 F.2d 53, 56 (3d Cir.1981) (Seitz, C.J., dissenting).[8] Many courts have elaborated on the circumstances under which a potential liability exception should apply.[9] Generally, proof of actual liability is required where the settling indemnitee does not notify the putative indemnitor of a potential settlement of the underlying litigation, thereby depriving the indemnitor of an opportunity to approve the settlement, participate in the settlement negotiations, or assume the defense of the underlying claim. *See Atlantic Richfield Co. v. Interstate Oil Transport*, 784 F.2d 106, 110–13 (2nd Cir. 1986).

"Notice sufficient to give the indemnitor a meaningful opportunity to defend is the indispensable element to be proven by the party seeking indemnity. If the indemnitor declines either to approve the settlement or to take over the defense, the indemnitee is required to prove only its potential liability to the plaintiff." *Atlantic Richfield*, 784 F.2d at 110–11. When the indemnitee has not given the indemnitor an opportunity to review, pass upon, or participate in the settlement, due process and equity require the indemnitee to demonstrate actual as opposed to potential liability.[10] There are no rigid rules regarding the type of notice which the indemnitee must give to indemnitor. The primary concern is fairness to the indemnitor. A formal tender of defense is not required, rather notice and an opportunity to participate is all that is necessary. *See, e.g., Morris v. Schlumberger*, 445 So.2d 1242, 1246 (La.App.1984) (citing *Burke, Parfait* and *Jennings* ). Thus, "where the party having a duty to indemnify has been notified or been made a party to the underlying proceedings and given an opportunity to participate in its settlement negotiations, courts have concluded that the defendant-indemnitee should not be required to prove the plaintiff's actual ability to recover the amount paid in the settlement. It is sufficient if the defendant-indemnitee proves that he was potentially liable to the plaintiff." *Valloric v. Dravo Corp.*, 178 W.Va. 14, 357 S.E.2d 207, 211–12 (1987).[11]

Neither the Tenth Circuit nor the Oklahoma Supreme Court have directly addressed the issue of what notice a settling indemnitee is required to give a putative

---

**8.** As recognized by Chief Judge Seitz, the decision whether to require actual liability in all situations or to recognize a potential liability exception is an important one. On the one hand, if actual liability is always required, settlements will be discouraged because of the difficult burden placed upon the indemnitee to establish its right to indemnification. On the other hand, the rule adopted must not be unfair to the indemnitor, who should be able to show that the indemnitee was not under a legal compulsion to pay the settled claim. *Frederick*, 642 F.2d at 56 (Seitz, C.J., dissenting).

**9.** *See, e.g., Burlington Northern, Inc. v. Hughes Bros., Inc.*, 671 F.2d 279 (8th Cir.1982); *Missouri Pac. R.R. Co. v. International Paper Co.*, 618 F.2d 492, 497 (8th Cir.1980); *Central National Ins. Co. v. Devonshire Coverage Co.*, 565 F.2d 490, 495–96 (8th Cir.1977); *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir.1973); *Whisenant v. Brewster–Bartle Offshore Co.*, 446 F.2d 394 (5th Cir.1971); *Missouri Pac. R.R. Co. v. Arkansas Oak Flooring Co.*, 434 F.2d 575, 580 (8th Cir.1970); *Tankre-*

*deriet Gefion A/S v. Hyman–Michaels Company*, 406 F.2d 1039 (6th Cir.1969); *Hess Oil Virgin Islands Corp. v. Firemen's Fund Ins. Co.*, 626 F.Supp. 882 (D.Vi.1986); *Dominic v. Hess Oil Virgin Islands Corp.*, 624 F.Supp. 117 (D.V.I.1985); *Terra Resources, Inc. v. Lake Charles Dredging and Towing, Inc.*, 555 F.Supp. 406 (1981), *aff'd*, 695 F.2d 828 (5th Cir.1983); *Burke v. Ripp*, 619 F.2d 354 (5th Cir.1980); and *M & O Marine, Inc. v. Marquette Co.*, 730 F.2d 133 (3d Cir.1984).

**10.** *Whisenant*, 446 F.2d at 403; *Parfait*, 484 F.2d at 305; *Morris v. Federated Mutual Insurance Co.*, 497 F.2d 538, 543–44 (5th Cir. 1974); and *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1216 (5th Cir.1986); *Atlantic Richfield*, 784 F.2d at 112–13; *Tankrederiet*, 406 F.2d at 1042.

**11.** *See also Burke*, 619 F.2d at 356–60; *Parfait*, 484 F.2d at 305; *Tankrederiet*, 406 F.2d at 1039; and *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*, 957 F.2d 1575, 1583–84 (11th Cir.1992).

indemnitor in order to trigger the "potential liability" exception to the general "actual liability" rule for indemnity actions. The decisions of the Tenth Circuit and Oklahoma Supreme Court which tangentially address the issue are, however, in accordance with the authorities discussed above—that a settling indemnitee need only show potential as opposed to actual liability to the injured party, as long as the putative indemnitor was given adequate notice of the settlement and an opportunity to object and assume defense of the action.

The Tenth Circuit has considered the effect of a settlement in a case where there was an express indemnity contract. In that case, the Tenth Circuit held as follows:

> Ordinarily, to sustain a claim upon an indemnity contract ..., it is necessary for the indemnitee to prove legal liability to the injured party. However, in Oklahoma and elsewhere in indemnity cases, where the indemnitor denies liability under the indemnity contract and refuses to assume the defense of the claim, then the indemnitee is in full charge of the matter and may make a good faith settlement without assuming the risk of being able to prove absolute legal liability or the actual amount of the damage. A contrary rule would make the right to settle meaningless in cases where the indemnitor has denied liability. [The only relevant inquiry] is whether the [indemnitee] made a reasonable, prudent and good faith compromise and settlement. In determining whether the settlement was made in good faith, the jury should consider the likelihood of a recovery by [the injured party] against the [indemnitee] and the reasonableness of the amount of the settlement ....

*Chicago R.I. & P.R. Co. v. Dobry Flour Mills,* 211 F.2d 785, 787–88 (10th Cir.1954) (internal citations and footnotes omitted). There is no evidence of a formal tender of defense in *Dobry.* And while the Court did not discuss exactly what type of notice the indemnitee was required to give the indemnitor prior to settling the injured party's claim, it is clear that notice of the underlying claim and notice of a settlement was sufficient in that case.

The Oklahoma Supreme Court's decision in *Booker* involved a party who was injured when a gas heater exploded. The injured party sued the manufacturer of the wall heater and the distributor of the wall heater. The injured party also sued the refiner, wholesaler and retailer of the natural gas that powered the heater. Prior to trial, the injured party settled his claims with the manufacturer and distributor of the heater. Trial proceeded on a products liability theory against the refiner, wholesaler and retailer of the natural gas, and resulted in a complete defense verdict. Six months prior to trial, the wholesaler had requested that the refiner take over its defense of the action. When the refiner refused to take over the wholesaler's defense, the wholesaler filed an indemnity claim against the refiner. At the conclusion of trial, the wholesaler sought judgment on its indemnity claim in the amount of the fees and costs it had expended in defense of the injured party's claim. The trial court dismissed the wholesaler's indemnity claim, and the wholesaler appealed to the Oklahoma Supreme Court. *Booker,* 785 P.2d at 298.

The question which the Oklahoma Supreme Court confronted was whether a manufacturer has a duty to indemnify its dealer against the cost of defending claims for loss caused by the manufacturer's defective product, even when the product is ultimately determined not to be defective. The majority recognized that the duty of a manufacturer to indemnify its dealer typically arises when the dealer is held liable because of the manufacturer's defective product. Nevertheless, the majority held that the manufacturer's duty to indemnify against the cost of defending product liability claims was not limited to situations where the product was ultimately determined to be defective. However, so as not to run afoul of the American Rule, pursuant to which everyone is responsible for their own legal fees, the Court held that the dealer must have taken a position at

trial which was consistent to that taken by the manufacturer (i.e., the dealer must have conferred some benefit on the manufacturer). *Booker*, 785 P.2d at 298–99.

The majority's opinion in *Booker* sheds little light on the issue faced by the Court in this case (i.e., actual versus potential liability). However, the concurring opinion by Justices Summers and Doolin does provide some assistance. The concurring Justices wrote separately to clarify the basis for the indemnity claim recognized by the majority. They wrote to make it clear that the manufacturer's indemnity obligation was not based on a contract, but implied by law (i.e., a quasi contract). *Booker*, 785 P.2d at 300–301. While discussing the nature of the manufacturer's indemnity obligation, the concurring Justices discussed what type of notice the dealer would be required to give the manufacturer before it would be able to seek indemnity from the manufacturer. The concurring Justices held that the dealer "must notify the manufacturer and give him an opportunity to defend . . . ." *Id.* at 304. The Justices held, however, that "[a] formal tender is not required if the manufacturer is given notice of the underlying action 'particularly if the indemnitor is a party to the action and the indemnitee's claim of indemnity is part of that action.'"

*Id.* at 304 n. 6 (citing *Hanover Limited v. Cessna Aircraft Co.*, 758 P.2d 443, 450 (Utah App.1988)). The concurrence in *Booker* does not address the case of a settling indemnitee like we have in this case. There is, however, no suggestion in the concurring opinion that dealers would have to establish their actual liability to the injured party before they could seek indemnification from manufacturers, as long as the manufacturer has adequate notice of the underlying lawsuit by the injured party.

Holmes' relies principally on 15 Okla. Stat. § 427 [12] for its argument that to recover against Holmes for indemnity, Home must prove that it was actually liable, as opposed to potentially liable, to Cooper. Holmes argues that this statute establishes that Oklahoma requires a formal tender of the defense of an action to the putative indemnitor before an indemnitee may seek indemnification based only on his potential, as opposed to actual liability, to the injured party. The undersigned does not agree.

The undersigned finds that § 427 is not directly applicable to Home's indemnity claim. The reason § 427 is not applicable "is that section 427 begins with the language: 'In the interpretation of a contract of indemnity the following rules are to be

---

12. Section 427 provides as follows:
 In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears:
 1. Upon an indemnity against liability, expressly, or in other equivalent terms, the person indemnified is entitled to recover upon becoming liable.
 2. Upon an indemnity against claims or demands, or damages or costs, expressly, or in other equivalent terms, the person indemnified is not entitled to recover without payment thereof.
 3. An indemnity against claims or demands, or liability, expressly or in other equivalent terms, embraces the costs of defense against such claims, demands or liability incurred in good faith, and in the exercise of reasonable discretion.
 4. The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters

embraced by the indemnity; but the person indemnified has the right to conduct such defense, if he chooses to do so.
 5. If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter, suffered by him in good faith, is conclusive in his favor against the former.
 6. If the person indemnifying, whether he is a principal or a surety in the agreement, has not reasonable notice of the action of proceedings against the person indemnified, or is not allowed to control its defense, judgment against the latter is only presumptive evidence against the former.
 7. A stipulation that a judgment against the person indemnified shall be conclusive upon the person indemnifying, is applicable if he had a good defense upon the merits, which, by want of ordinary care, he failed to establish in the action.

applied, unless a contrary intention appears.' Since 'contracts' in Title 15 are express or implied in fact, and since indemnity sought in the present case must arise, if at all, in quasi-contract, section 427 does not apply." *Booker,* 785 P.2d at 302 (Summer, J. and Doolin, J., concurring). Section 427 also describes the effect of a "judgment" in the underlying action on a subsequent indemnity claim. Section 427(6) does not address the effect of a "settlement" in the underlying action on a subsequent indemnity claim. For these reasons, the undersigned finds that § 427 is not sufficiently on point to overcome the weight of applicable authority discussed above, which holds that when a putative indemnitor has been notified of the underlying lawsuit and given an opportunity to participate in its settlement negotiations, the indemnitee may settle the case without fear of having to prove actual ability to the injured party in a subsequent indemnity action.

### B. APPLICATION OF THE RULE—HOME NEED ONLY PROVE THAT IT WAS POTENTIALLY LIABLE TO COOPER BECAUSE HOLMES WAS ON NOTICE OF COOPER'S CLAIM AND HOLMES HAD AN OPPORTUNITY TO PARTICIPATE IN SETTLEMENT NEGOTIATIONS AND TO OBJECT TO THE SETTLEMENT.

■ At oral argument, the parties agreed that the issue of whether Home was required to establish actual or potential liability to Cooper was a question for the Court to decide. The undersigned agrees that the actual versus potential liability issue should be decided by the Court. Leaving the issue for the jury essentially requires Home to put on its case as if it were required to establish actual liability because Home would not know until the end of trial whether it was required to prove actual or potential liability. Having reviewed the evidence in the summary judgment record, the undersigned finds that there is sufficient evidence in the record for the Court to decide the actual versus potential liability issue without the need for an evidentiary hearing.

A brief history of this litigation is appropriate to put the discussion of Holmes' notice into context. Cooper filed this lawsuit against Home in the bankruptcy court in September 1994. After extended briefing on the issue, the reference to the bankruptcy court was withdrawn and the case was transferred to this Court's docket in March 1995. Doc. No. 16. Cooper moved for reconsideration of the order withdrawing the reference and after extended briefing, the motion to reconsider was denied in May 1995. Doc. No. 29. The first case management conference was held in late July 1995. Throughout September, October and November 1995, the parties filed a series of dispositive motions directed at each other's claims and defenses. These motions were ruled on in April and May of 1996. The case was stayed from April 1996 to July 1996 to permit the parties to pursue settlement discussions. When the case did not settle in July 1996, the first Scheduling Order was entered in August 1996, which set a discovery deadline in February 1997 and a trial date in May 1997. Doc. No. 114. In October 1996, Home filed its motion for leave to amend its answer to add its third party indemnity and contribution claims against Holmes. Doc. No. 123. In January 1997, a settlement conference was set before Judge Lee West for February 1997. It was at this February 1997 settlement conference that Cooper and Home settled the underlying lawsuits for $7.5 million. The Court granted Home's request for leave to amend to add indemnity and contribution claims on March 7, 1997, and the bankruptcy court approved the $7.5 million settlement on March 18, 1997. Doc. No. 156.

It is undisputed that Holmes was aware of Cooper's claims against Home almost from the inception of this lawsuit. It is also undisputed that in October 1996, shortly after Home filed its application for leave to assert indemnity and contribution claims against Holmes, Holmes was aware that Home was asserting an indemnity claim against Holmes. Shortly after Home's motion for leave to amend its An-

swer was filed, Dan Wagner, an attorney for Home, had a telephone conversation with Jim Sturdivant, an attorney for Holmes. Mr. Wagner and Mr. Sturdivant briefly discussed Home's indemnity claim and set a date for a meeting between Home's lawyers and Mr. Sturdivant. At the end of October 1996, lawyers for Home met with Mr. Sturdivant in person for approximately two hours to discuss Cooper's claims and Home's claim of indemnity against Holmes. Home's lawyers also made overtures to Mr. Sturdivant about Holmes participating with Home in the defense of and discovery in the underlying Cooper case. Mr. Sturdivant expressed his shock that Home would attempt to seek indemnity from Holmes. At the meeting, Mr. Sturdivant vehemently denied that Holmes had any indemnity liability to Home, and Mr. Sturdivant essentially told Home's lawyers that Holmes would see them at the courthouse. *See* Doc. No. 277, Exhibits "21–23;" and Doc. No. 301, Exhibit "48."

After the October 1996 meeting, Home began sending deposition transcripts, other discovery materials and pleadings to Holmes for its review and to keep Holmes apprized of the underlying litigation with Cooper. Home also notified Holmes prior to the February 18, 1996 settlement conference that a settlement conference would be held before Judge West. Within days of the settlement conference, Holmes was notified that a settlement with Cooper had been reached. It is also undisputed that Holmes was aware of the settlement before it was approved by the bankruptcy court, and that Holmes interposed no objections to approval before the bankruptcy judge.

The undersigned finds that Holmes was given an opportunity to "participate" [13] in the underlying case. Holmes was also able, if it so chose, to participate in the February 1997 settlement conference. Holmes declined to do either as it had not yet been joined as a formal party because Judge Burrage had not granted Home's motion for leave to amend. The undersigned finds further that Holmes had notice of the underlying claims by Cooper many months prior to the settlement conference. Holmes also had notice that Home was asserting an indemnity claim against Holmes approximately four months before the settlement conference and five months before the settlement was approved by the bankruptcy court. Given the fact that Holmes was on notice of the underlying claim and Home's indemnity claim, and the fact that Holmes had an opportunity to participate in settlement negotiations, and object to the settlement if it so chose, the undersigned finds that Home was entitled to settle the underlying Cooper case without fear of having to prove actual ability to Cooper in an indemnity action against Holmes. The undersigned finds, therefore, that to recover on its indemnity claim against Holmes, Home need only establish that it was potentially liable to Cooper and that the $7.5 million was a reasonable settlement of that potential liability.

## VI. COUNT II—THERE ARE MATERIAL QUESTIONS OF FACT WHICH PRECLUDE THE ENTRY OF SUMMARY JUDGMENT ON HOME'S CONTRIBUTION CLAIM.

 The parties agree that Home's contribution claim is governed by 12 Okla.

**13.** The Restatement of the Law of Judgments § 107, Comment e, contains the following statement: "There must also be a tender of control either joint or full. In order to bind the indemnitor in a subsequent action against him, the indemnitee is not obligated necessarily to surrender the entire control of the defense; he must, however, request the indemnitor to participate, and if judgment is given against the indemnitee he must permit the indemnitor to take appellate proceedings. Such tender is not essential if the indemnitor indicates that he would not participate and on the other hand it is not essential if in fact the indemnitor does participate." It is undisputed that Home asked Holmes to participate and that Holmes indicates that it would not participate. Thus, under the rule of the first restatement of judgments, Home was not required to make a more formal "tender" to Holmes than it did at its October 1996 meeting with Mr. Sturdivant.

Stat. § 832—Oklahoma's version of the Uniform Contribution Among Tortfeasors Act. Home has asserted its contribution claim in the alternative to its indemnity claim. Home argues that Holmes is entirely at fault for Home's $7.5 million liability to Cooper. However, if the jury disagrees, Home argues that Holmes is at least partially at fault (i.e., a joint tortfeasor), and Home is entitled, pursuant to § 832, to contribution from Holmes in the amount of Holmes' *pro rata* share of fault.

## A. *PRO RATA* SHARE

Section 832 states that

[t]he right of contribution exists only in favor of a tort-feasor who has paid more than their *pro rata* share of the common liability, and the total recovery is limited to the amount paid by the tort-feasor in excess of their *pro rata* share. No tortfeasor is compelled to make contribution beyond their *pro rata* share of the entire liability.

12 Okla. Stat. § 832(B).

Holmes argues that it is entitled to summary judgment on Home's contribution claim because Home's *pro rata* share of the common liability is 100% and Holmes' *pro rata* share of the common liability is 0%. In other words, Holmes argues that it had no fault at all with regard to Cooper. This argument is similar to the fault argument Holmes made in connection with Home's indemnity claim. However, all Holmes had to establish to defeat Home's indemnity claim was that Home was partially at fault. To defeat Home's contribution claim, Holmes has to show that Home was totally at fault with regard to Cooper. For the same reasons the undersigned found material questions of fact precluding summary judgment in connection with Home's indemnity claim, the undersigned finds material factual issues on Home's contribution claim. Questions as basic as who knew what and when; who did what and when; and who agreed to do what and when, permeate the entire summary judgment record with regard to the conduct of Home and Holmes, their relationship with Cooper and their handling of the litigation which sprang from Cooper's March 1984 Warning letter. The undersigned finds, therefore, that the Court should not grant summary judgment on Home's contribution claim on the basis that Holmes has 0% fault as to Cooper.

## B. REASONABLENESS OF THE $7.5 MILLION SETTLEMENT

■ Section 832 states that

[a] tort-feasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor . . . in respect to any amount paid in a settlement which is in excess of what was reasonable.

12 Okla. Stat. § 832(B).

Holmes argues that it is entitled to summary judgment on Home's contribution claim because the $7.5 million settlement is *per se* unreasonable. Holmes does not, however, suggest a settlement amount that it believes would have been reasonable. The undersigned finds that Holmes has not presented a valid basis upon which to grant summary judgment.

Even if Holmes were correct and it is was undisputed that the $7.5 million settlement is unreasonable, that fact alone would not support a total summary judgment against Home's contribution claim. Holmes is free at trial to establish, for example, that the settlement was for $3.5 million dollars more than was reasonable. That "unreasonable" amount would be taken off the top, leaving $4 million that was reasonable. The jury would then apportion the $4 million according to its finding regarding Home's and Holmes' relative fault as joint tortfeasors. The fact that some portion of the settlement is unreasonable is relevant to Holmes' ultimate liability, but not dispositive.

Cooper was seeking approximately $86 million in actual damages, which could have been trebled to in excess of $250 million, without taking into account Cooper's punitive damage claims. The $7.5 million settlement was, therefore, a frac-

tion of the potential liability Home faced. Bankruptcy Judge Wilson approved the settlement. Judge Lee West was the settlement judge at the settlement conference which resulted in the settlement. Cooper's president, Mr. Barton, and the lawyers who negotiated the settlement believe that it was a reasonable settlement. The undersigned finds that a reasonable jury could conclude from the evidence currently in the summary judgment record that the $7.5 million settlement was reasonable. Summary judgment on the basis of the *per se* unreasonableness of the settlement is, therefore, not appropriate.

### VII. WHAT EVIDENCE MAY HOLMES' PRESENT AT TRIAL IN AN ATTEMPT TO ESTABLISH THE UNREASONABLENESS OF THE $7.5 MILLION SETTLEMENT?

The parties agree that an element of Home's indemnity and contribution claim is the reasonableness of the $7.5 million settlement of Cooper's claims. What the parties do not agree on is the type and scope of evidence which is relevant to such an inquiry. The parties' briefs on this issue are more in the nature of a motion *in limine*. The undersigned declines, therefore, to issue a definitive ruling on the issue. The undersigned finds that the issue is more appropriately resolved in a final fashion at a pre-trial conference when the Court will be able to evaluate the parties' arguments in relation to a particular piece of evidence or line of inquiry. Nevertheless, the undersigned offers the following observations.

To evaluate the reasonableness of a particular settlement, one must place themselves in the position of the parties at the time settlement was being discussed. The reasonableness of the settlement should be evaluated considering what information was available to the parties at the time a settlement was being contemplated. As a general proposition, second guessing and Monday-morning quarter-backing should not be permitted when evaluating a settlement at some future date—hindsight is nearly always 20/20. The undersigned believes, however, that it is permissible to show that a party contemplating settlement did not conduct the type or manner of investigation a reasonable person would have conducted before determining to settle a claim. It is within this framework that Holmes should be able to attack the reasonableness of Home's settlement with Cooper.

The undersigned has previously determined that Home should not be required to prove its actual liability to Cooper. Holmes should, therefore, be precluded from litigating or re-litigating the merits of the underlying claims asserted by Cooper against Home. Holmes is, however, permitted to attack the reasonableness of the settlement of those claims. Depending on the scope of such a reasonableness attack, it could easily devolve into a re-litigation of all of the underlying claims. The issue is, therefore, one of degree. The Court must balance Holmes' right to attack the reasonableness of the settlement against Home's right to be free from having to litigate the merits of the underlying claims in order to establish Holmes' indemnity obligation. Again, the undersigned declines to strike that balance in this Report and Recommendation. The undersigned leaves the balance to be struck by the trial judge who will be in a much better position to evaluate specific evidentiary proffers.

### RECOMMENDATION

The undersigned recommends that Holmes' motion for summary judgment be **DENIED**. [Doc. No. 247]. The undersigned finds material question of disputed fact permeate the summary judgment record and warrant the denial of summary judgment.

### OBJECTIONS

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned. As part of his/her review of the record, the District Judge will consider

the parties' written objections to this Report and Recommendation. A party wishing to file objections to this Report and Recommendation must do so within ten days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court. *See Moore v. United States,* 950 F.2d 656 (10th Cir.1991); and *Talley v. Hesse,* 91 F.3d 1411, 1412–13 (10th Cir.1996).

June 2, 2000.

### ORDER DENYING
### RECONSIDERATION

Now before the Court is "The Holmes Organisation, Inc.'s Motion to Reconsider [the June 5, 2000 Report and Recommendation] of U.S. Magistrate Judge." [Doc. No. 328]. For the reasons discussed below, The Holmes Organization's ("Holmes") motion to reconsider is **DENIED.**

The Court will not reiterate the procedural and factual history of this case. The parties are referred to the reports and recommendation filed in this case on June 2, 2000 for the complete background of this litigation. *See* Doc. Nos. 322 and 323.

In the June 5, 2000 Report and Recommendation (doc. no. 322), the undersigned found that The Home Indemnity Company ("Home") was asserting an implied indemnity claim based on the common law. The undersigned found that the indemnity obligation owed by Holmes to Home is based on a quasi-contract, pursuant to which the common law imposes an indemnification obligation on Holmes due to the relationship which existed between Home and Holmes. As stated in the Report and Recommendation, Holmes has never disputed, and still does not in its motion to reconsider, "that an implied-in-law indemnity obligation could arise out of the agency relationship between itself and Home." Doc. No. 322, p. 9. Thus, the indemnity claim in Count I of Home's Second Amended Third Party Complaint is, and has always been, based on an implied-in-law, and not an express, obligation.

With its motion to reconsider, Holmes is attempting to select for Home the legal theory upon which Home's indemnity claim will be based.[1] Holmes insists that Home's indemnity claim is based on an express contract, and since the filing of its motion for summary judgment, Holmes has been searching for a writing upon which to hang Home's indemnity claim. Holmes believes that it has now found such a writing, and it attaches to its motion to reconsider a Producer Agreement entered into between Home and Holmes on May 1, 1989. Home has never relied on this agreement in any pleading as the source of the indemnity obligation upon which it is suing. Rather, Home has steadfastly relied on the common law. Holmes cannot force Home to predicate its indemnity claim on the Producer Agreement when it chooses to predicate its claim on the common law.

As indicated in the Report and Recommendation, Home is only seeking indemnification from Holmes for that portion of the $7.5 million settlement which is attributable to Home's liability to Cooper for causing Cooper's bankruptcy and liqui-

---

1. Holmes wants to characterize Home's indemnity claim as being based on an express contract, and not a quasi-contract, because of its belief that 15 O.S. § 427 imposes a rigid requirement that a formal and particularized "tender" of the underlying lawsuit be made before an indemnitee, in an indemnification action, can be relieved of its obligation to prove actual liability in the underlying lawsuit. Holmes believes that § 427 is more exacting than the common law standard articulated in the June 2nd Report and Recommendation. *See* Doc. No. 322, pp. 16–19. The undersigned will not resolve any alleged conflict between § 427 and the common law, because as stated in the Report and Recommendation, § 427 does not apply to Home's implied-in-law indemnity claim which is based on the common law and not an express contract.

dation by delaying its defense of Cooper against the defective rig claims. Cooper was in bankruptcy and liquidated by 1986. Thus, any conduct by Holmes upon which Home would rely to establish Holmes' duty to indemnify Home would necessarily have occurred prior to 1986 when Cooper was liquidated. The Producer Agreement was not executed until 1989. Thus, the Producer Agreement was not in effect at the time of the major conduct (e.g., Holmes' pre-bankruptcy failure to notify Home of claims, and Mr. Bogart's "no coverage" opinion) on which Home bases its claim for indemnity. This fact indicates why it would make no sense for Home to sue on the Producer Agreement attached to Holmes' motion to reconsider.

## CONCLUSION

The Court finds no basis to modify its June 2, 2000 Report and Recommendation. [Doc. No. 322]. Holmes' motion for reconsideration is, therefore, **DENIED**. [Doc. No. 328].

IT IS SO ORDERED.

June 22, 2000.